**UNITED STATES of America,**
**Appellee,**

v.

**Gilbert Joseph EATHERTON,**
**Defendant-Appellant.**

**No. 74–1330.**

United States Court of Appeals,
First Circuit.

Argued May 7, 1975.

Decided July 18, 1975.

Certiorari Denied Nov. 17, 1975.
See 96 S.Ct. 396.

Daniel J. O'Connell, Boston, Mass., for appellant.

Robert B. Collings, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

At approximately 1:00 p. m. on March 25, 1974, three men entered the Suburban National Bank in Arlington, Massachusetts. The men were armed, and were similarly dressed. Each was wearing a dark (described by witnesses as black or navy blue) knit ski mask which effectively obscured his facial features. In the space of a few minutes they had robbed the bank of $10,443.81, and exited from the bank. An assistant cashier testified to seeing the men fleeing in the direction of Churchill Avenue.

Another prosecution witness testified that at approximately this same time he was driving his car up Churchill Avenue when he observed a "silver" automobile suddenly emerge from a driveway behind the bank, make an abrupt turn into the avenue, run the corner stop sign, and then disappear down Churchill Avenue traveling at a high rate of speed. A car fitting this description, subsequently ascertained to have been stolen, was discovered soon after the robbery parked on a residential street approximately four blocks from the bank.

The robbers departed the area of the crime without being apprehended. No clues were found at the scene or in the abandoned car, and because of the masks worn in the bank the eyewitnesses to the robbery were of no help in identifying the perpetrators of the crime. Police located two witnesses who were outside the bank around the time of the robbery

and had seen three men who were probably the robbers. These witnesses gave the law enforcement officials information leading them to conclude that appellant, Gilbert Joseph Eatherton, was one of those men. He was subsequently arrested and on April 4, 1974, was indicted by a grand jury for the armed robbery of the Suburban National Bank in violation of 18 U.S.C. §§ 2113(a) & (d).

Identity was the principal issue at Eatherton's jury trial. He offered several alibi witnesses in an attempt to show that he could not have been in Arlington at the time of the robbery. Some doubt was cast upon their testimony, however, by cross-examination and by two rebuttal witnesses presented by the Government. The jury evidently chose to disbelieve appellant's alibi. Upon its verdict of guilty a judgment of conviction was entered, and he was sentenced to 18 years' imprisonment. In this appeal he presents four claims: that his identification was the result of impermissible police suggestion, that physical evidence introduced by the prosecution was the fruit of an unreasonable search, that the trial court abused its discretion in admitting this evidence even if it was not unconstitutionally obtained, and that the court's charge to the jury was improper.

**I**

Inquiry by the Arlington Police and the Federal Bureau of Investigation (FBI) at the house before which the silver vehicle was discovered led to Miss Janet Leak, a high school senior, who was the principal eye witness at appellant's trial. The officers learned that Miss Leak had observed the three men who had been in the silver gray automobile. She told the officers that while walking down Churchill Avenue at about 1:00 p. m. she had seen the large silver car traveling unusually fast and followed by a small green car. When she began walking down Lincoln street towards her home she observed that these two vehicles were parked in front of her house. As she approached her home the three occupants of these cars got out and then

all three entered the silver auto. Leak passed within several feet of these three individuals and testified that she had them in her view for about a minute. She also stated that she had obtained a better view of the individual in the front passenger seat than of the two others.

At their request Leak accompanied two FBI agents to the bank to see if she could aid them in identifying the men. In the bank, approximately an hour after the robbery, Miss Leak was shown a green album containing a number of photographs of adult males. The album, which had been prepared by the FBI, bore on its front cover the small, taped-on legend, "Bank Robbery Suspect Photographs."

Leak was asked to look through this album to determine if any of the pictures looked familiar or if she could identify any of the three men she had observed. On her first time through this book she indicated two to four "possibilities" to the agents but made no positive identification of any photograph. One of the photos which she indicated was a possibility, identified only as number 14 in the album, was that of appellant.

Two of the FBI agents then discussed the "possibles" which Leak had indicated. One of these agents, who was evidently familiar with many of the men whose photographs appeared in the album, "eliminated" all the possibles save appellant. This conversation was held approximately six feet from where Leak was sitting with another agent and an Arlington police officer, but, according to the testimony of one of the conversants, was conducted sufficiently *sotto voce* to prevent Leak from overhearing.

The agents requested that Leak again go through the photo album in an attempt to obtain a "suspect." On this last time through Leak selected only one picture—appellant's.

On the afternoon of the robbery a young man, Michael Gookin, and his companion were walking down Churchill Avenue alongside the Suburban National Bank. Bookin's attention was attracted by three men approaching the bank wearing navy blue ski hats, and he also observed a vehicle left running in a driveway nearby. He passed within about seven yards of the men, and although their somewhat unusual headgear for such a warm day had stimulated his attention, he did not take a close look at any of them.

Later in the day Gookin learned some of the facts surrounding the robbery of the bank and contacted the Arlington Police in the belief that his observations might be of some help in solving the crime. That evening he and his companion were taken to the Massachusetts Bureau of Identification by Arlington police officers. His companion proved of no assistance in identifying the men, apparently because she had only barely observed them as they passed. Gookin, however, was able to give a general description of two of the men and had sufficient recollection of one to be able to assemble an ident-a-kit facial composite of that individual with the assistance of an officer from the Bureau of Identification.

Gookin was then requested to look through several drawers of photographs corresponding roughly to the description he had given. At some point after Gookin had looked through a substantial number of these photos [1] the Arlington police officers present learned that appellant—presumably on the basis of Leak's earlier identification—had become a suspect in the crime. They obtained a color photograph from Bureau files and showed it to Gookin, inquiring whether he thought it looked like one of the men he had seen. Gookin replied that he thought it did, but that he wasn't sure.

---

1. The Bureau of Identification officer's testimony, based on the average content of each drawer, would lead one to conclude that Gookin had viewed in the vicinity of 800 photographs, while Gookin testified that it seemed to him that he had gone through only about 70–75.

Gookin was then shown a spread of seven to eight photos which included a black and white copy of the portrait of appellant he had just been asked about. He noted that fact to the officers. After he had completed his examination of this spread he was told that earlier in the day another witness had identified the individual in that photo. While he later indicated that this information had reassured him, he held to the opinion that he would have to see the man in person before he could make any positive identification.

The next day, March 26, both Leak and Gookin were exposed to further investigatory attempts to identify the men they had seen in the vicinity of the bank. They were separately brought to the Boston Municipal Court, Leak by Arlington police officers and Gookin by FBI agents, in the expectation that appellant would be there in regard to another matter. The law enforcement officials apparently intended to arrange some sort of opportunity for them to observe appellant in person, but when they reached the courthouse Eatherton had departed. At some point Leak and Gookin were alone together in a corridor for a short time, and, according to Gookin's testimony at trial, "probably" discussed their respective attempted identifications of the men they had seen.

Surrounding this failed attempt to effect some sort of confrontation with appellant, both witnesses were again shown photo displays and asked whether they could identify anyone. On the way to the BMC Leak was shown the composite prepared by Gookin the previous evening, as well as a seven photo spread which contained a copy of the same photo of appellant which she had seen in the

green FBI album the previous day. Leak again selected this photo as one of the men she had seen.

Gookin, after the BMC visit, was taken to FBI headquarters where he was shown a spread of eight photographs. The results of that attempt at identification are not clear,[2] but the jury was told only that Gookin had again been unable to identify anyone. He was also shown the green album, without result.

In the course of the continuing investigation of the robbery both Gookin and Leak were shown photographic spreads on several other occasions. On March 28, Leak was shown the same seven photo spread which had been displayed to her two days before, and she again selected appellant's picture. On March 31, she was presented a nine picture spread, but she again identified only the photo of Eatherton, which she had by that time seen at least three to five times. On April 3, prior to appearing before the grand jury, Leak was shown an entirely new spread of eight photographs by the Assistant United States Attorney. She failed to select a picture of appellant included in that group. Before the grand jury she was again shown the green album and repeated her selection of photo number 14—Gilbert Eatherton. She may also have been shown the album on one occasion several months after her grand jury appearance, but this is not clear from the testimony. In any event, she saw no photographs in any form for at least two months prior to the trial.

Gookin was shown a photo[3] of Eatherton on March 28 by the Arlington police, who asked whether it was of the man he had seen. He indicated his belief that it was. Gookin also apparently was shown

---

**2.** At the suppression hearing two FBI agents testified that Gookin had picked out appellant's picture from this spread as one of the men he had seen near the bank. Gookin, however, was uncertain whether he had done so, and at the trial testified that he had been unable to pick out anyone. The two agents did not testify at the trial regarding Gookin's alleged identification of appellant from this photo spread.

**3.** There is some conflict in the testimony offered at the suppression hearing, unresolved by any specific finding of the court, as to whether Gookin was shown a spread containing appellant's photograph or merely the single photo.

the green photo album and some photo spreads containing appellant's picture on several other occasions, but his testimony at the voir dire was very confused on these points. It can be generalized that on some occasions he selected appellant's picture from such displays, and that he was sometimes told that others had formed the opinion that appellant was one of the robbers. It does not affirmatively appear that Gookin ever positively identified appellant's photo as the image of one of the men he had seen near the bank—as opposed to merely selecting the same photo he had previously been shown on numerous occasions.

At the trial Leak positively identified appellant as one of the three men she had seen on the day of the robbery. Gookin, however, when called to the stand did not make a positive identification. When asked to look around the courtroom to see if there was anyone he could point to as having been near the bank on March 25, he stated that he could not: "Some are very similar, but I am not certain." When pressed he pointed to appellant as someone who appeared "very similar" to one of the men he had seen.

■ Appellant argues that the admission of the Leak and Gookin testimony was error. He contends that the identification procedures used prior to the trial were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). After an extensive voir dire hearing on appellant's motion to suppress the anticipated in-court identifications on the basis of *Simmons,* the district court denied the motion as to both witnesses. Correctly adopting the "totality of the circumstances" standard for reviewing this

claim, 390 U.S. at 383, 88 S.Ct. at 970; *see Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the court concluded that the photographic identification procedures had not exceeded the *Simmons* limitation. We think this ruling was not erroneous.

■ As to the witness Leak, the district court found—based primarily upon her own testimony—that she had received "no suggestion whatsoever when she looked through the FBI album," and that her initial selection of appellant's picture from the album had been an independent decision made without difficulty on her part. As these findings are supported in the record, they effectively dispose of the claim that Leak's initial selection of appellant's photo as that of one of the men she had seen near the bank was the product of impermissible suggestion. More troublesome, however, are her repeated exposures to photo displays containing the same picture she had previously identified. While there may have been sound investigatory reasons for some of these,[4] the practice is obviously subject to abuse. If the witness' initial selection of a photograph is somewhat equivocal or may have been influenced by suggestive procedures—albeit not ones of a magnitude which, standing alone, would require the suppression of an in-court identification—subsequent repetitive exercises which do little more than test the witness' ability to again select that photograph are likely to have the effect of fixing that image in the witness' mind with a corresponding blurring of the image actually perceived at the crime. *Cf. United States v. Workman,* 470 F.2d 151, 153 (4th Cir. 1972); *Kimbrough v. Cox,* 444 F.2d 8, 10–11 (4th Cir. 1971).

The district court made no specific finding on the effect of these procedures

---

4. For example, Inspector O'Brien of the Arlington police testified at the suppression hearing that the nine photo spread he had shown Leak on March 31, included photographs of a number of individuals known to have previously associated with Eatherton. O'Brien hoped that this display might lead to an identification of the other two men involved in the robbery. While this may have been sound police practice, we do not perceive the necessity for including appellant's already selected photo in this spread, especially in view of the fact that he was already in custody. *Cf. United States v. Fowler,* 439 F.2d 133, 134 (9th Cir. 1971).

upon Leak's ability to identify Eatherton. But in view of its findings on the independence and strength of her initial selection, we conclude that the repeated display of appellant's photo did not impermissibly prejudice him. Leak had received a good opportunity to see one of the men, at close range and in good light, only a few hours before viewing the album, cf. Neil v. Biggers, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Allen v. Moore, 453 F.2d 970, 974 (1st Cir.), cert. denied, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972), and had concluded that appellant's photo was that of this man. There is no evidence that her subsequent reselections of this photo were other than cumulative reassertions of the original decision. We do not believe that they presented the "very substantial likelihood of irreparable misidentification" requiring suppression of Leak's identification. See United States v. DeLeo, 422 F.2d 487, 497 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).

■ The totality of the circumstances regarding Gookin, as the district court recognized, present an aggregate which is closer to the line. In Gookin's case the danger of supplanting his recollection with the image in the photograph was real. Cf. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). However, Gookin never succumbed to the temptation to overstate his memory of the man he saw. He adhered to the position that he could not be sure that appellant was one of the men, and at the trial he identified Eatherton only as similar to that man. We see no realistic possibility that irreparable misidentification could have been the result of the questionable procedures followed, the qualified nature of the identification itself providing a persuasive indication that the police conduct was without significant effect.

## II

On the morning of March 27, two FBI agents were waiting in the vicinity of an address in Everett, Massachusetts, where they believed appellant might be. They were aware that an application was being made to obtain a warrant for Eatherton's arrest, and their orders were to locate him, presumably so that the warrant when obtained could be expeditiously effected. While they were waiting, however, they received information that Eatherton was in the vicinity but that he appeared to be fleeing or in preparation for flight. The agents quickly located him a few blocks away and decided to arrest him. Appellant does not dispute that the agents possessed probable cause to arrest.

The agents saw Eatherton on the street and called for him to come over to their car. He did so, carrying a briefcase which was in his hand when they first observed him. When he came close to the vehicle the agents told him he was under arrest, instructed him to drop the briefcase and spread eagle on the ground. Eatherton complied, and the agents thoroughly frisked him, then handcuffed him behind his back and placed him in the car. The agents then picked up the briefcase and opened it. Inside they found, among other items, a loaded .38 caliber revolver and three brown ski masks. They inventoried and marked for identification all the contents of the briefcase, which were subsequently admitted into evidence over appellant's objection.[5]

■ Appellant argues that opening and examining the briefcase was an unreasonable search under the fourth

---

5. The items found in the briefcase and introduced into evidence consisted of:
   "One .38 caliber Smith and Wesson revolver loaded with 6 rounds of high velocity, cavity-nose ammunition;
   One Sears and Roebuck Craftsman dent puller;
   Three brown ski masks;
   One pair of gray slacks;
   Two boxes of sheet metal screws;
   One pair of leather gloves;
   One pair of black shoes;
   One screwdriver."

amendment and that the fruits of that search, the contents of the briefcase, should have been suppressed. As noted earlier, he does not dispute that there was probable cause to arrest, and he concedes that the agents could have seized the briefcase consonant with the fourth amendment. Indeed, he argues that they should have done so. But, in his view, after obtaining custody of the case, the agents then should have obtained a search warrant before investigating its contents. He stresses that any urgency to inspect the interior of the briefcase was completely removed once he had been subdued and the case removed from his possession and beyond his possible reach. From this he argues that we should strike a balance which maximizes protection of his asserted expectation of privacy in the briefcase and require that judicial permission be sought before it can be opened.

Appellant's approach to balancing fourth amendment values is not without some logical cogency. See *United States v. Soriano*, 482 F.2d 469 (5th Cir. 1973); *Bracco v. Reed*, 17 Crim.L.Rep. 2198 (D.Ore. May 13, 1975). However, we think the rule he seeks is without support in the cases. The strongest Supreme Court decision for the position espoused by appellant would seem to be *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Yet that opinion cited, with apparent approval, *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in which a search virtually identical to that at issue here was upheld. 395 U.S. at 760 n. 4, 89 S.Ct. 2034. Several court of appeals decisions applying *Chimel* had little apparent difficulty upholding searches identical to that contested here. *United States v. Maynard*, 439 F.2d 1086 (9th Cir. 1971); *United States v. Mehciz*, 437 F.2d 145 (9th Cir.), *cert. denied*, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); *United States ex rel. Muhammad v. Mancusi*, 432 F.2d 1046 (2d Cir. 1970), *cert. denied*, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971). And in light of the Court's most recent pronouncements on the fourth amendment, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), we do not believe that appellant's suggested balance can be sustained.

The line which he attempts to draw placing the briefcase beyond the search of his "person" which *Robinson* and *Gustafson* expressly approve is one requiring gossamer distinctions. There is no indication that the result in those cases would have been any different had the cigarette packages been in the defendants' hands rather than in their pockets or if they had been dropped to the ground in response to police command. While a briefcase may be a different order of container from a cigarette box, it is not easy to rest a principled articulation of the reach of the fourth amendment upon the distinction. Cf. *United States v. Micheli*, 487 F.2d 429 (1st Cir. 1973). Justice Marshall made an argument not unlike that of appellant in his dissent to *Gustafson* and *Robinson*, 415 U.S. at 256–59, 94 S.Ct. 1234, 39 L.Ed.2d 771 (Marshall, J., dissenting), but while that position may have analytical appeal, see *The Supreme Court, 1973 Term*, 88 Harv.L.Rev. 41, 187 (1974), it does not presently represent the law. In *Edwards* the Court, after noting that the courts of appeals have generally permitted searches of both "the person and the property in his immediate possession," 415 U.S. at 803, 94 S.Ct. at 1237, stated:

"Indeed, it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest."

*Id.* at 806, 94 S.Ct. at 1238. These observations were in the context of searches in the station house after an arrest. However, there can be little doubt that they apply equally to searches in the field immediately incident to the arrest. Appellant has conceded the agents properly seized the briefcase as an incident to

his arrest. At that point any expectation of privacy which he held with regard to the briefcase was taken out of

> "the realm of protection from police interest in weapons, means of escape, and evidence."

*United States v. DeLeo, supra* at 493, *quoted with approval in Edwards,* 415 U.S. at 808–09, 94 S.Ct. 1234, 39 L.Ed.2d 771.

### III

We discuss appellant's final two claims together. He contends that the admission into evidence of the contents of the briefcase allowed the jury impermissibly to convict him because they believed that he was engaged in other crimes or that he was a dangerous person, rather than for the specific violations with which he was charged. In his brief he readily concedes that, "Innocent people do not carry three ski masks with a loaded gun." However, he argues that unless these objects could be specifically tied to the robbery of the Arlington bank, they were too prejudicial for the jury to be permitted to consider them. Having failed to persuade the trial court that the items should be excluded, he then sought a charge instructing the jurors that they could not speculate concerning either the defendant's character or reputation or the use of these items if it was found that they were not used in the bank robbery. Since the brown masks were not the same as the navy blue or black ones described by witnesses, and there was nothing to tie this revolver to the handguns used at the Suburban National Bank, this charge would have been tantamount to directing the jury that the objects should be disregarded altogether. The district court declined to give the requested instruction.

On the issue of admissibility, there is some dispute as to whether appellant properly raised this ground of objection in the trial court, but assuming the claim is properly before us, we find it without merit.

The evidence may have suggested that appellant was in the business of armed robbery. If its only value was to show appellant's bad character or other criminal activity, it would be inadmissible under familiar principles. But it tended also to prove that he was one of the robbers in question, and as this court said in *Green v. United States,* 176 F.2d 541, 543 (1st Cir. 1949), "[I]t is . . . clear that [evidence] otherwise relevant is not rendered inadmissible merely because its tendency is to prove the commission of some other crime." *Cf. United States v. Hopkinson,* 492 F.2d 1041, 1043 (1st Cir.), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974). The test of admissibility requires balancing the prejudicial potential of the evidence against its probative value, and that task is committed primarily to the trial court. *See United States v. Brettholz,* 485 F.2d 483, 487 (2d Cir. 1973), *cert. denied sub nom., Santiago v. United States,* 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 871 (1974); *United States v. Ravich,* 421 F.2d 1196, 1203–05 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970); *cf.* Fed.R.Evid. 401–03, 404(b). The gun and three ski masks introduced at Eatherton's trial corresponded to functionally similar accessories used a few days before in the Arlington robbery. Even if not used in that robbery, the number and character of the items tended logically to associate appellant with that particular crime. *See Green, supra* at 543, *quoting from Bracey v. United States,* 79 U.S.App.D.C. 23, 142 F.2d 85, 87–88 (1944). Like much relevant circumstantial evidence, the objects do not, by themselves, establish guilt beyond a reasonable doubt. But like the discovery of an army uniform in the wardrobe of one suspected of committing a crime in which one of the participants wore such a uniform, the evidence in question enhanced the probability of guilt, and, combined with other evidence such as Miss Leak's identification, was plainly probative. The point of which the jury could properly take notice is not that innocent people do not carry

the particular combination of items, but rather that the bundle of implements is distinctive enough to support the Government's argument that appellant was one of the individuals making use of very similar instruments several days earlier. The court did not abuse its discretion in admitting the items.

■ With regard to the contents of the briefcase the trial court instructed the jurors:

"The Court charges you that you may also consider physical evidence which has been admitted during the trial. As with testimonial evidence, you may accept or reject such physical evidence as probative of the crime charged.

If you find that the ski masks and/or the gun which were allegedly in the defendant's possession at the time of his arrest were not the mask and/or the gun used in the robbery of the Suburban National Bank of Arlington on March 25, 1974, you may not speculate concerning the defendant's character or reputation.

You may, however, give such weight to it as you deem proper, that is, to the physical evidence. You may give such weight to it as you deem proper in light of all the evidence in the case.

You may, of course, convict the defendant only if you find beyond a reasonable doubt that he is guilty of the crime charged, . . . the robbery of the Suburban National Bank of Arlington on March 25, 1974."

In addition to appealing from the court's refusal to give the instructions which he submitted, appellant argues that the portion of the charge contained in the third paragraph of the above excerpt somehow gave the jury too much leeway in deciding what inferences could be drawn from the items in the briefcase. He contends that the charge given, to which he seasonably objected, Fed. R.Crim.P. 30, was so ambiguous and misleading as to confuse and prejudice the jury. However, the court quite properly warned the jurors against using the evidence to infer guilt from character. It

could be appropriately used in conjunction with other evidence to identify appellant as one of the three robbers, and, if the jurors adhered to the instructions, this was how it was used. We find no error in the instruction, which was an apt one in the circumstances.

### IV

■ That disposes of all the issues raised by the parties. A further matter requires our attention, however. The double conviction and sentences under the Bank Robbery Act, 18 U.S.C. §§ 2113(a) and (d), for a single crime constitute plain error under *O'Clair v. United States,* 470 F.2d 1199 (1st Cir. 1972), *cert. denied,* 412 U.S. 921, 93 S.Ct. 2741, 37 L.Ed.2d 148 (1973). We vacate the judgment in its present form and remand to the district court for entry of a new judgment embodying the conviction and sentence under Count 2 only.

*So ordered.*