STATE OF NORTH CAROLINA v. WILLIAM FRANK POWELL

No. 375A86

(Filed 3 February 1988)

**1. Criminal Law § 66.14— impermissibly suggestive pretrial identification procedures—identification at trial of independent origin**

The trial court in a prosecution for first degree rape, first degree sex offense, and crime against nature did not err by admitting the victim's in-court

State v. Powell

identification of defendant even though the prosecuting witness first saw defendant at a one-man showup in a parking lot at 2:00 a.m.; a detective subsequently showed the prosecuting witness a photographic lineup which contained a year-old photograph of defendant; when the witness could not make a positive identification from that lineup, the detective put in a picture of defendant taken that day; and, when the victim still could not identify the defendant, the detective again arranged a one-man showup. The superior court found that the victim's in-court identification of defendant was of independent origin and untainted by illegal pretrial procedures based on evidence that the witness had ample opportunity to observe the person as he committed the crime, that she paid attention to him, and that she was able to describe him to officers.

2. **Criminal Law § 181.2— motion for appropriate relief—newly-discovered evidence—lack of due diligence**

The trial court in a prosecution for rape, first degree sex offense, and crime against nature did not err by denying defendant's motion for appropriate relief based on newly-discovered evidence where the evidence showed that the defendant knew of the new evidence during the trial and the superior court concluded that defendant did not act with due diligence in seeking that witness. N.C.G.S. § 15A-1415(b)(6).

3. **Constitutional Law § 34— mistrial—no double jeopardy**

The trial court in a prosecution for rape, first degree sex offense, and crime against nature, did not err by denying defendant's motion to dismiss on a plea of former jeopardy where the defendant had made the motion for a mistrial in his former trial.

Justice FRYE dissenting.

Chief Justice EXUM joins in the dissenting opinion.

APPEAL by defendant from a life sentence imposed by *Tillery, J.*, at the 13 January 1986 Criminal Session of Superior Court, DARE County. Heard in the Supreme Court 11 December 1986.

The defendant was charged with first degree rape, first degree sex offense, and a crime against nature. He was tried on these charges in September 1985 in a trial which ended in a mistrial. He was tried a second time in January 1986. At the end of the State's evidence the court allowed a motion to dismiss the charge of crime against nature. The jury found the defendant guilty of first degree rape and not guilty of first degree sex offense. The defendant appealed from the imposition of a life sentence.

*Lacy H. Thornburg, Attorney General, by Francis W. Crawley, Assistant Attorney General, for the State.*

*G. Irvin Aldridge for defendant appellant.*

WEBB, Justice.

The defendant has brought forward three assignments of error pursuant to Rule 28(b)(5), Rules of Appellate Procedure and supported them by reason and authority. We shall consider these three assignments of error.

[1] The defendant's first assignment of error deals with the identification testimony of the prosecuting witness. The defendant objected to this testimony and a voir dire hearing out of the presence of the jury was held. The prosecuting witness testified that on 17 August 1982 she was staying at a cottage in Kitty Hawk, North Carolina. She arose early that morning and went to the beach at approximately 5:10 a.m. to watch the sun rise. She sat on the beach for five to ten minutes at which time she saw a man approaching. The man came to her and asked if she had a cigarette. She told him she did not. After some conversation he drew a knife and forced her to a dune, at which time he raped her and performed cunnilingus on her. She escaped from him some time later and returned to the cottage in which she was staying with her fiance and her fiance's parents. She testified she was with her assailant for approximately forty minutes, during which time there was sufficient light that she had no trouble identifying him.

The prosecuting witness reported the incident to the Dare County Sheriff's Department and she was interviewed that day by several deputy sheriffs and by W. A. Hoggard, III, a special agent with the State Bureau of Investigation. Mr. Hoggard exhibited to her a photographic lineup which did not contain the defendant's picture. She was not able to identify her assailant in the lineup although she said one photograph appeared to be similar to the defendant. Later that day Mr. Hoggard carried the prosecuting witness to a commercial artist who drew a picture of the assailant from the prosecuting witness' description. The prosecuting witness testified the picture was similar to her assailant but did not "really resemble him."

At approximately 2:00 a.m. the next morning Mr. Hoggard called the prosecuting witness and asked her to come to a bar and look at a man. The prosecuting witness was driven to the bar by her fiance where the defendant was standing in the parking lot under a light. The prosecuting witness stayed in the automobile and observed the defendant from a distance of approximately twenty feet. She testified "I remember pulling up in the parking lot and I began to shake uncontrollably when I started observing him, and he was wearing those same green pants and he had on the same muscletype t-shirt, but I didn't get to look at his face." Mr. Hoggard testified that he went to the prosecuting witness who was seated in the automobile. He said "[She] stated the individual she had seen me talking to had the same basic build and size as her assailant on the beach, but, due to the distance and the lighting, she was not able to get a close-up view of his facial features and could not make a positive identification."

On 21 August 1982 Mr. Hoggard showed another photographic lineup to the prosecuting witness. It contained a year old picture of the defendant. The prosecuting witness selected the defendant's picture and said it "appeared to be him, but the hair—appeared to be her attacker, but the hair and moustache were quite a bit different from the person she observed on the beach on August 17, 1982." Mr. Hoggard had a photograph made of the defendant that day and placed it in the second photographic lineup he had shown the prosecuting witness. The prosecuting witness told Mr. Hoggard that this picture looked like her attacker, but she could not be positive and she would like to see the individual in person.

As a result of the prosecuting witness' request, Mr. Hoggard called the defendant who agreed to meet Mr. Hoggard and the prosecuting witness to determine whether he was the assailant. They met in the parking lot of a supermarket. It was daylight. The defendant was wearing a three piece suit and a necktie. The prosecuting witness told Mr. Hoggard the defendant looked very similar to her assailant but she still could not make a positive identification. This occurred on 22 August 1982 and the prosecuting witness left that day for her home in Virginia.

The prosecuting witness talked to Mr. Hoggard several times by telephone and wrote him letters in September 1982 and March

1983. In late May 1985 she called Mr. Hoggard and told him she could identify her assailant. She met Mr. Hoggard in the district attorney's office in Elizabeth City at which time she was shown the two photographic lineups she had been shown in the summer of 1982. She identified the photograph of the defendant as a picture of the man who assaulted her in 1982. The prosecuting witness testified that she could identify the defendant as the man who had assaulted her because she had several nightmares and the face of her assailant kept appearing in them. This was the face of the defendant.

The court made findings of fact consistent with this evidence and held:

> From the foregoing findings of fact, the Court concludes as a matter of law: After having considered the opportunity of the witness to view the person at the scene, the degree of attention which the witness described in her viewing of him, as well as her description of him physically and of his clothing and jewelry, after having considered the accuracy of the witness' description as she gave it to Agent Hoggard, the level of certainty demonstrated by the witness that the in-court confrontation yesterday in which she stated that she was absolutely certain of the defendant as being her attacker and after having considered the length of time between the crime and the confrontation, the Court has come to the conclusion that all of the circumstances do not reveal pretrial procedure so unecessarily [sic] suggestive and conducive to irreparable mistake in identification as to offend fundamental standards of decency, fairness and justice. The Court has further concluded as a matter of law that the in-court identification of the defendant is of independent origin and untainted by illegal pretrial identification procedures.

The court denied the motion to suppress the prosecuting witness' in-court identification of the defendant.

Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification. *State v. Wilson*, 313 N.C. 516, 330 S.E. 2d 450 (1985). The first inquiry when a motion is made to suppress identification testimony is whether the pretrial

identification procedure is impermissibly suggestive. If it is determined that the pretrial identification procedure is impermissibly suggestive the court must then determine whether the suggestive procedure gives rise to a substantial likelihood of irreparable misidentification. Factors to be considered in making this determination are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and confrontation. *State v. Hannah*, 312 N.C. 286, 322 S.E. 2d 148 (1984) and *State v. Headen*, 295 N.C. 437, 245 S.E. 2d 706 (1978).

In this case the superior court concluded "that all of the circumstances do not reveal pretrial procedure so unecessarily [sic] suggestive and conducive to irreparable mistake in identification as to offend fundamental standards of decency, fairness and justice." This may be construed as a finding that the pretrial procedure was not impermissibly suggestive. The evidence showed that the prosecuting witness first saw the defendant at a one man showup in a parking lot at 2:00 a.m. After this, Mr. Hoggard showed the prosecuting witness a photographic lineup which contained a year old photograph of the defendant. When the prosecuting witness could not make a positive identification from this lineup, Mr. Hoggard put a picture of the defendant taken that day in the same photographic lineup and showed it to the prosecuting witness. When she could not identify the defendant on this occasion, he again arranged a one man showup. It may certainly be argued from this that the pretrial procedures were impermissibly suggestive.

It is not necessary for us to determine whether the pretrial procedures were impermissibly suggestive. In *State v. Bundridge*, 294 N.C. 45, 239 S.E. 2d 811 (1978), this Court held that although the trial court may have erred in finding a pretrial procedure was not impermissibly suggestive it was not error to allow an in-court identification when the trial court found, based on sufficient competent evidence, that the witness' identification was independent of the pretrial procedure. In this case, the superior court found that the in-court identification of the defendant was of independent origin and untainted by illegal pretrial procedures. The superior court relied on the evidence that the witness had ample

opportunity to observe the person as he committed the crime and that she paid attention to him and was able to describe him to the officers. These are three of the five factors which we have said may be used to determine whether an identification is of independent origin. The court also relied on the positive in-court identification by the witness. There are two factors, the level of certainty demonstrated at the pretrial confrontations and the time between the crime and the confrontation which did not support this finding. In light of the three factors which the court considered, we cannot hold that the court erred in finding the identification was of independent origin. This assignment of error is overruled.

[2] The defendant next assigns error to the denial of his motion for appropriate relief based on newly discovered evidence. While the trial was in progress the defendant's attorney inspected notes Mr. Hoggard had made during his investigation. These notes showed Mr. Hoggard had interviewed a Mr. and Mrs. William Deem of New Kensington, Pennsylvania. The Deems were staying in a cottage across the street from the place at which the rape occurred. Mrs. Deem told Mr. Hoggard that at approximately 6:15 a.m. she and her husband had observed through binoculars a black male and a white female in the dunes. The couple stayed in the dunes approximately twenty minutes and then walked hand in hand toward the beach.

After a hearing on the defendant's motion for appropriate relief the court made findings of fact to which no exceptions were made. The court found as facts that the defendant examined Mr. Hoggard's notes during the trial, at which time he learned of Mrs. Deem's statement and that he did not ask for a recess for the purpose of procuring Mrs. Deem as a witness. The court concluded that the defendant did not act with due diligence to procure this witness and her testimony would not be newly discovered evidence.

N.C.G.S. § 15A-1415 provides in part:

(a) At any time after verdict, the defendant by motion may seek appropriate relief upon any of the grounds enumerated in this section.

(b) The following are the only grounds which the defendant may assert by a motion for appropriate relief made more than 10 days after entry of judgment:

. . . .

(6) Evidence is available which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered or made available at that time, and which has a direct and material bearing upon the guilt or innocence of the defendant.

This section of the statute codifies substantially the rule previously developed by case law for the granting of a new trial for newly discovered evidence. *See State v. Beaver*, 291 N.C. 137, 229 S.E. 2d 179 (1976). The evidence showed that the defendant knew of the statement of Mrs. Deem during the trial. The superior court concluded the defendant did not act with due diligence in seeking this witness. We cannot hold the court abused its discretion in doing so. *See State v. Person*, 298 N.C. 765, 259 S.E. 2d 867 (1979). If the defendant did not act with due diligence in seeking this witness he is not under N.C.G.S. § 15A-1415(b)(6) entitled to a new trial.

[3]   The defendant next assigns error to the denial of his motion to dismiss on a plea of former jeopardy. At the first trial there was testimony identifying the defendant as the perpetrator of the crime before the court knew the defendant's principal defense was lack of identity. The defendant made a motion for mistrial at this point. The court made findings of fact that this identification testimony had been allowed before a voir dire hearing was held to determine its admissibility. It found in part:

If the Court finds the victim's in-court identification is tainted by viewing the defendant and photographs of him between the time  of the attack and the trial, then the Court would have to reverse its earlier ruling and such proceeding would result in substantial and irreparable prejudice to the defendant's case. If the Court rules the in-court identification is not tainted, then the ruling of the Court is suspect because of the natural tendency to sustain one's prior conduct.

The court allowed the motion for mistrial.

The defendant argues that he has been twice put in jeopardy for the same offense by being tried a second time. The defendant made a motion for mistrial. It was not error to overrule his plea of former jeopardy. *State v. Britt*, 291 N.C. 528, 231 S.E. 2d 644 (1977).

No error.

Justice FRYE dissenting.

In my opinion, the dispositive issue in this case is whether the trial judge erred in allowing into evidence the victim's positive identification of the defendant as her assailant. Believing that the admission of this evidence was prejudicial error, I vote for a new trial.

The State's evidence at trial showed that the victim was sexually assaulted during the early morning hours of 17 August 1982. Defendant was not arrested or charged with any offense relating to this incident until the summer of 1985. On 22 July 1985, he was charged in a single indictment with first-degree rape, first-degree sexual offense, and crime against nature. The State's evidence at his trial beginning 13 January 1986 (a previous trial ended in a mistrial) identified defendant as the perpetrator of the offenses. Defendant testified in his own behalf and denied being the victim's assailant. He also offered alibi evidence. The trial court allowed defendant's motion to dismiss the charge of crime against nature at the close of the State's evidence. The jury acquitted defendant of first-degree sexual offense but found him guilty of first-degree rape. The judge accordingly imposed the mandatory life sentence, and defendant appealed from that judgment to this Court.

Defendant argues that the trial judge erred in denying his motion to suppress the victim's identification of him as her assailant on the grounds that it was tainted by pretrial identification procedures that violated defendant's constitutional right to due process. In considering a similar challenge in a recent case, we said:

> The test for determining whether pretrial identification procedures were impermissibly suggestive is clear. 'Identification evidence must be excluded as violating a defendant's

right to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification.' *State v. Harris*, 308 N.C. 159, 162, 301 S.E. 2d 91, 94 (1983). As defendant correctly notes, determination of this question involves a two-step process. First, the Court must determine whether the pretrial identification procedures were unnecessarily suggestive. If the answer to this question is affirmative, the court then must determine whether the unnecessarily suggestive procedures were so impermissibly suggestive that they resulted in a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite*, 432 U.S. 98, 53 L.Ed. 2d 140 (1977); *State v. Flowers*, 318 N.C. 208, 347 S.E. 2d 773 (1986); *State v. Headen*, 295 N.C. 437, 245 S.E. 2d 706 (1978). Whether a substantial likelihood exists depends on the totality of the circumstances.

> The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson*, 432 U.S. at 114, 53 L.Ed. 2d at 154. *State v. Fisher*, 321 N.C. 19, 23, 361 S.E. 2d 551, 553 (1987).

I turn now to consider the out-of-court and pretrial identification procedures used in the instant case.[1]

On 19 August 1982, the victim went to the police station and was shown a photographic lineup containing six pictures (Lineup 1). The lineup represents black men of differing heights, ages, and general appearances. There was no photograph of defendant in this lineup. The victim selected one of the photos as being "similar" to her assailant but was unable to make an identification. She

---

1. Defendant's written motion to suppress refers only to the victim's in-court identification, but in denying this motion at the close of the *voir dire*, the trial judge stated in effect that he would regard the defendant as having a continuing objection to the victim's testimony on the entire issue of identification.

was then given the police department's "mug book" and allowed to leaf through it. She selected no one from the mug book. Next, she was taken to a commercial artist who prepared a sketch with the victim's assistance. The victim said that the resulting drawing did not really look like her assailant but had some similarities. The police posted a description of the assailant and copies of the sketch at various places in the community.

In the early morning hours of 21 August 1982 (Friday night-Saturday morning), the SBI agent conducting the investigation received a call from a local bar in response to a copy of the sketch. He went to the bar and interviewed defendant. Defendant denied any involvement in the rape. He lived on the mainland, in Grandy, and denied coming to the beach at all during that week. The SBI officer testified that defendant was quite cooperative. He agreed to stand outside the bar, under the streetlight, so that the victim could drive past and see him, which she did at about 2 a.m. The victim said at the time that the defendant's build and clothes were similar to her attacker's but that she had not been able to see defendant's face clearly under the streetlight. She was unable to make an identification.

The SBI officer made up a second photographic lineup (Lineup 2) and took it later on that day (Saturday, 21 August 1982) to the cottage where the victim was staying. This lineup contained a photograph of defendant taken the previous year. The victim selected defendant's photograph as being similar to her attacker, but she was unable to make an identification.

The SBI officer obtained a search warrant to photograph defendant and seize his watch, pocketknife, and ring. He added this new photograph to lineup 2 and took the augmented lineup (Lineup 2a) back to the victim. On this occasion, she selected the new photograph of defendant as being someone similar to her attacker, but she was again unable to make a positive identification.

The SBI agent arranged another opportunity for the victim to view defendant in person, with defendant's cooperation, at about noon on the next day (Sunday, 22 August 1982) in the parking lot of a shopping center. The victim, who was on her way back to her home in Virginia, stopped in the parking lot. On this occasion, defendant was dressed for church in a suit, with his hair

combed. The victim was unable to make an identification. She said she was not sure and mentioned the difference in hair and dress.

In May 1985, nearly three years after the rape, the victim contacted the police and indicated that she had become seriously interested in having defendant prosecuted. She returned to Kitty Hawk on 7 June 1985, where she was again shown Lineup 1 and Lineup 2a in their original condition. She selected defendant's second photograph without hesitation. I believe that under the circumstances surrounding this identification procedure, the procedure was unduly suggestive.

During the initial investigation in 1982, the victim told the police, including the SBI agent who was also present at the 7 June 1985 meeting, that she would have difficulty in the identification of a black male because of her prejudiced attitude toward blacks and her fear of them and her inability to communicate with them. She was subsequently unable to identify defendant as her assailant on four separate occasions, twice in photographs and twice in person. She was similarly unable to identify defendant's watch and ring as being those of her assailant.[2] She wrote the SBI agent a letter in September 1982, in which she inquired about the progress of his investigation and remarked, "There are so many black men in that area. I'm sure it would be hard to locate him. Needless to say, the few I looked at were *very* similar in facial and physical features." (Emphasis in original.) The letter continued, "Every now and then I'll see a black man and of course my mind will flash back, but ever so slowly the whole episode is fading." In March of the following year, however, she wrote the agent that she "realized" by that time that "the man at the bar, wearing: [sic] loose-fitting green pants, and a white T-shirt" was her assailant. She referred to him as being "fully disguised" at the Sunday showup in the parking lot. The victim was never told about any possible suspects other than defendant, although at least one other man was questioned.

Despite the March 1983 letter, no further steps were taken until the victim herself contacted the police again in May 1985, saying that she could not put the episode behind her until she

2. She said they were "similar." The watch and ring appear to have been commonly-found types.

"took action." At this point, almost three years had passed since the rape, and considering the easily-remembered position of defendant's second photograph in Lineup 2a, I believe that presenting the victim with the two identical lineups she had seen before, not changed in any way, was not so much a test of her ability to identify her assailant as of her memory of the defendant's photograph and its position.

Having concluded that the 7 June 1985 identification procedure was unduly suggestive, it must now be determined whether this procedure created a substantial likelihood of irreparable misidentification. In making this determination, the test is whether, under the totality of the circumstances, the victim's out-of-court identification on 7 June 1985 was reliable. At the pretrial identification procedure in question, on 7 June 1985, and at the trial itself, the victim quite emphatically identified defendant as her attacker. However, three points undercut this factor in this case as a guide to the reliability of the identification. First, despite the fact that the victim announced in her letter of 10 March 1983 that she knew she could pick defendant out of a "lot of different faces"—"probably in a split second," she never realized that there were two photographs of defendant in Lineup 2a. Second, the victim herself originally expressed considerable doubt about her ability to identify her assailant accurately because of his race. Third, the victim was initially unable to identify defendant as her attacker at a point when the crime was fresh in her mind. She said at that time that she did not want to identify anyone incorrectly and hence would not do so unless she was sure. However, she never offered any explanation for her original uncertainty, and when asked what had made her sure three years later, she replied that there were two things. One was thinking about the rape as time passed. The other was a recurring portion of a nightmare. Neither add to the assurances of reliability. The passage of so much time raises a very real possibility that the victim's memory of the crime had blurred. Indeed, the victim herself wrote in her letter to the SBI agent only a month after the rape that "the whole episode is fading." Furthermore, her testimony abundantly shows that her memory for some of the details of the crime and the surrounding events had in fact faded.

When the corrupting effect of the unduly suggestive pretrial identification procedure is weighed against the *Manson* factors to

determine the reliability of the victim's identification of defendant, these factors provide insufficient indicia of reliability to overbalance the suggestiveness in the 7 June 1985 presentation of the photographic lineups. The potential for tainting the victim's identification in this case was enormous. The victim was initially doubtful of her ability to recognize her attacker, and she failed to identify defendant on four separate occasions when her memory of her attacker was fresh in her mind. As her memory faded with the passage of time, the potential danger of suggestive pretrial identification procedures grew, especially for procedures that harkened back to suggestiveness in the earlier procedures. The risk involved was aptly described by the First Circuit in *United States v. Eatherton,* 519 F. 2d 603, 608 (1st Cir.), *cert. denied,* 423 U.S. 987, 46 L.Ed. 2d 304 (1975),

> If a witness' initial selection of a photograph is somewhat equivocal or may have been influenced by suggestive procedures—albeit not one of a magnitude which, standing alone, would require the suppression of an in-court identification—subsequent repetitive exercises which do little more than test the witness' ability to again select that photo are likely to have the effect of fixing that image in the witness' mind with a corresponding blurring of the image actually perceived at the crime.

(Citations omitted.)[3]

The totality of the circumstances in the instant case reveal a very substantial likelihood of irreparable misidentification. First, the very speed with which the victim selected defendant's photograph on the occasion in question, while at the same time utterly failing to perceive that another photograph of defendant appeared in the same lineup, indicates that it was indeed her recollection of the photograph that was being exercised, rather than her recollection of her attacker. Second, when events were fresh in the victim's memory, she was unsure about defendant, even after four viewings, and could only say that he was similar, a statement she also made about a photograph of a different person in Lineup 1.

---

3. In *Eatherton,* the First Circuit eventually concluded that given the positiveness of the witness' initial identification, the subsequent exposures to the same photograph had probably not affected her subsequent identifications.

The victim testified that she had become positive about her identification of defendant because of the passage of time, which in this case is a factor strongly pointing away from reliability, and because of her recurring nightmare. According to the victim's testimony, she had been having this nightmare before she wrote her September 1982 letter to the SBI agent. Yet, in this letter, she inquired about the progress of his investigation, said that her memories were fading, and made no mention of identifying defendant as her attacker. Although in a letter written seven months after the rape, she said that she had come to realize that the man she saw at the showups was her attacker, she did not in fact make a positive identification of defendant until nearly three years later. At that time, she did not perceive that defendant appeared twice in Lineup 2a, despite her statement in the second letter that she knew she could pick out his face in a split second. Third, she added at least one identifying detail to her description of her assailant only after seeing defendant. She also "explained" or altered those portions of her initial description that did not fit defendant. She spoke of defendant as being "totally disguised" at the only showup where she had a good view of his face, when all he had done was don a suit and brush his hair. I also note that defendant was initially picked up as a result of a sketch that the victim herself said did not look like her assailant. Finally, the victim's testimony shows that her memory of associated events and of certain details of the rape itself have blurred with the passage of time. Accordingly, the victim's out-of-court identification of defendant on 7 June 1985 should have been suppressed. *See Foster v. California*, 394 U.S. 440, 22 L.Ed. 2d 402 (1969) (where repetitive, suggestive lineups changed an uncertain identification to a certain identification, admission was error).

The same test of reliability must now be applied to the victim's in-court identification. However, except to the extent that the in-court identification may have been buttressed by viewing defendant at the preliminary hearing and at the first trial (which resulted in a mistrial), there are no new factors to be considered in evaluating the reliability of the victim's in-court identification. Because under the facts of this case analysis is the same for the in-court identification as for the out-of-court identification, I would

hold that the victim's in-court identification should also have been suppressed.[4]

In so concluding, I intend no criticism of the able and experienced trial judge who heard this matter. Before ruling on the defendant's suppression motion, the judge remarked, "As far as I'm concerned this thing is right on the razor's edge." This case reflects a highly unusual situation, whose peculiar facts appear to be unique. Only in light of all of the factors present do I conclude that the victim's 7 June 1985 out-of-court identification and her in-court identification should have been suppressed.

Finally, having concluded that it was error to admit the victim's 7 June 1985 out-of-court identification and her in-court identification, it must be decided whether the error was prejudicial. Because a constitutional right is involved, the standard of review on appeal is whether the error was harmless beyond a reasonable doubt. See N.C.G.S. § 15A-1443(b) (1983); Chapman v. California, 386 U.S. 18, 17 L.Ed. 2d 705 (1967). Since the victim's positive identification was the only strong evidence tending to show that defendant was the perpetrator of the rape, I cannot say that its erroneous admission was harmless beyond a reasonable doubt. Thus, I would hold the error prejudicial and award defendant a new trial.

Chief Justice EXUM joins in this dissenting opinion.

---

4. Defendant also contends that an identification by the victim that occurred when defendant was in court for his preliminary hearing was impermissibly suggestive. There is no clear account of this identification, but apparently, before the preliminary hearing began, the SBI agent told the victim to go into the courtroom to see whether she could identify defendant. She did so. There was at least one other black man present; there may have been more. Based on the record before us, I cannot say that this procedure was unduly suggestive.