IN THE MATTER OF: C.B.G.
No. COA08-668
Court of Appeals of North Carolina
Filed December 2, 2008
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Phillip T. Reynolds, for the State.
Sofie W. Hosford for Respondent-juvenile.
ARROWOOD, Judge.
Respondent juvenile appeals from orders adjudicating him delinquent and imposing a level III disposition. We affirm.
On 7 November 2007, a juvenile petition was filed alleging that Respondent was a delinquent juvenile in that he feloniously did "steal, take, and carry, and carry away another's personal property, cell phone, U.S. currency, wallet of the value of $120 from the person and presence of James E. Bracey." The petition alleged that Respondent committed the offense "by means of an assault consisting of having in his possession and threatening the use of a handgun, a dangerous weapon, whereby the life of James E. Bracey was threatened and endangered." Respondent subsequently filed a motion to suppress the victim's identification of Respondent.
Respondent's case came before Judge Regan A. Miller at the 19 February 2008 Juvenile Session of Mecklenburg County District Court. The trial court first heard evidence regarding Respondent's motion to suppress. The State presented testimony from the victim and members of the Charlotte Police Department. The State's evidence tended to show that on 6 November 2007, around 10:00 p.m., James E. Bracey (Bracey) exited a bus on North Tryon Street and began walking toward his janitorial job. The streets were well-lit. Bracey noticed that he was being followed by two black male teenagers. Bracey sped up and so did the two males. When Bracey turned a corner onto West 24th Street, he heard something that sounded like a weapon shaking and sped up again. Bracey then found himself in a warehouse area where he was confronted by the two males standing in front of him. The male pointing a hand gun at Bracey's head told the other male, later identified as Respondent, to search Bracey. Respondent went through Bracey's pockets and retrieved Bracey's wallet, which contained ten dollars, and his cell phone. The male with the handgun told Respondent to search Bracey again to "make sure [he got] everything." Respondent again went through Bracey's pockets and some quarters fell to the ground. Respondent and the other male then took off running.
Bracey called 911 from a nearby telephone booth on West 24th Street and provided a brief description of the two males. Nearby officers began searching the area for the two males. After briefly canvassing the area for possible suspects, Officer R.G. Canfield, went to Bracey's location and Bracey provided Officer Canfield with a more detailed description of the two males. Bracey stated that the male with the handgun was between five feet six and five feet seven inches tall, wearing orange pants or shorts, and a white T-shirt. Bracey described Respondent as wearing a long sleeve shirt covered by a short sleeve shirt. Officer Canfield then updated the description of the suspects over his police radio.
A few minutes later, Officer Maques Pittman observed two males matching the description of the suspects in line at a convenience store, which was located six blocks from where the robbery took place. As Officer Pittman turned his vehicle around, he lost sight of one of the suspects. Officer Pittman made contact with Respondent who was still in line at the store. Officer Pittman notified Officer Canfield to bring Bracey to the store for a possible identification.
Officer Canfield arrived with Bracey within minutes. While in the police vehicle, Officer Canfield told Bracey that "in no means just because we got out with this individual that he was, in fact, the suspect" and that "he needed to make sure, not to come to any pre-conclusions." Upon viewing Respondent, who was not in handcuffs or seated in a patrol vehicle, Bracey "blurted out, `[t]hat's him.'" Officer Canfield asked Bracey if he was certain, and Bracey stated, "Yes, I'm 100 percent certain that [Respondent] was the individual who went through my pockets." After Mr. Bracey identified C.B.G., he was taken into custody. Respondent did not offer any evidence. The trial court denied the motion to suppress. Based on the evidence presented, the trial court adjudicated Respondent delinquent with respect to the offense of robbery with a dangerous weapon. After conducting a disposition hearing, the trial court entered a level three disposition for placement in a youth development center for an indefinite term not to exceed his eighteenth birthday. Respondent appeals.
Respondent challenges the trial court's denial of his motion to suppress Bracey's identification testimony. Respondent first argues that the "show-up" identification at a nearby convenience store was impermissibly suggestive, thus depriving Respondent of due process of law. We disagree.
Generally, a juvenile in an adjudication hearing has "[a]ll rights afforded adult offenders[,]" subject to certain exceptions not relevant to the present case. N. C. Gen. Stat. § 7B-2405(6) (2007). "These rights include the right to have the evidence evaluated by the same standards as apply in criminal proceedings against adults." In re Bass, 77 N.C. App. 110, 115, 334 S.E.2d 779, 782 (1985) (internal quotation omitted). Identification evidence is "excluded as violating a defendant's rights to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." State v. Hammond, 307 N.C. 662, 667, 300 S.E.2d 361, 364 (1983). Although show-ups have been criticized as inherently suggestive and unnecessary, they are not per se violative of a defendant's due process rights. State v. Turner, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982).
In evaluating the propriety of a show-up identification under the Due Process Clause, this Court must determine if the totality of the surrounding circumstances created a "substantial likelihood of irreparable misidentification" by the witness. Id. "An unnecessarily suggestive show-up identification does not create a substantial likelihood of misidentification where under the totality of the circumstances surrounding the crime, the identification possesses sufficient aspects of reliability." Id. The reliability of a show-up identification is determined by examining the following five factors:
(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and confrontation.
State v. Powell, 321 N.C. 364, 369, 364 S.E.2d 332, 335 (1988).
An examination of the circumstances of Bracey's identification of Respondent indicates no significant likelihood of misidentification under Powell. First, Bracey interacted with Respondent face to face. See State v. Lawson, 159 N.C. App. 534, 538, 583 S.E.2d 354, 357 (2003) (upholding identification where store clerk observed defendant's face while being held at gunpoint for approximately twenty-five seconds). Second, Bracey was able to pay particular attention to Respondent as Respondent twice went through Bracey's pockets. Third, Officer Pittman noticed that respondent accurately matched Bracey's updated description. See State v. Richardson, 328 N.C. 505, 512, 402 S.E.2d 401, 405 (1991) (admitting identification when witness description included clothing and approximate height and weight of assailant). Fourth, after observing Respondent, Bracey "blurted out, `[t]hat's him" and told Officer Canfield he was "100 percent sure" that Respondent was the person who went through his pockets. Finally, the confrontation took place less than an hour after the robbery. See State v. Mobley, 86 N.C. App. 528, 532, 358 S.E.2d 689, 691 (1987)(upholding identification where witness had viewed defendant for five to eight seconds during car jacking and police took the defendant to the witness about an hour after the incident ) . In sum, we hold that the totality of the circumstances indicate that Bracey's identification possessed sufficient reliability that there is not a substantial likelihood of misidentification.
Respondent also argues that the trial court erred in denying his motion to suppress without making findings of fact and conclusions of law. As our Supreme Court explained with respect to motions to suppress:
When the competency of evidence is challenged and the trial judge conducts a voir dire to determine admissibility, the general rule is that he should make findings of fact to show the bases of his ruling. If there is a material conflict in the evidence on voir dire, he must do so in order to resolve the conflict. If there is no material conflict in the evidence on voir dire, it is not error to admit the challenged evidence without making specific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. In that event, the necessary findings are implied from the admission of the challenged evidence.
State v. Phillips, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980) (internal citations omitted). "Findings and conclusions are required in order that there may be a meaningful appellate review of the decision." State v. Horner, 310 N.C. 274, 279, 311 S.E.2d 281, 285 (1984).
Here, the trial court made no findings of fact; however, there was no material conflict in the evidence as only the State presented evidence. Accordingly, the trial court properly denied Respondent's motion to suppress.
Respondent next contends the trial court abused its discretion in ordering a level three disposition in this matter and ordering him confined to a youth development center. Respondent asserts that the trial court's "ruling was entered to `send a message' rather than to act in C.B.G.'s best interest, which is contrary to the purposes of the juvenile code." We disagree.
Upon an adjudication of delinquency, the trial court must determine the juvenile's appropriate dispositional level depending on the juvenile's delinquency history and the type of offense committed. N.C. Gen. Stat. § 7B-2508 (2007). In this case, the juvenile was found delinquent for an offense classified as violent, N.C. Gen. Stat. § 7B-2508(a)(1) (2007), and had a "low" delinquency history level, N.C. Gen. Stat. § 7B-2507 (2007). Under N.C. Gen. Stat. § 7B-2508(f), the trial court was, therefore, authorized to impose either a Level 2 or a Level 3 disposition. See N.C. Gen. Stat. § 7B-2508(f)(2007). "Pursuant to the juvenile code, the juvenile court is required to select the most appropriate disposition calculated to both protect the public and to meet the needs and best interests of the juvenile." In re N.B., 167 N.C. App. 305, 310, 605 S.E.2d 488, 492 (2004) (internal quotations and citations omitted). N.C. Gen. Stat. § 7B-2501(c) (2007) specifically provides:
In choosing among statutorily permissible dispositions, the court shall select the most appropriate disposition both in terms of kind and duration for the delinquent juvenile. Within the guidelines set forth in G.S. 7B-2508, the court shall select a disposition that is designed to protect the public and to meet the needs and best interests of the juvenile, based upon:
(1) The seriousness of the offense;
(2) The need to hold the juvenile accountable;
(3) The importance of protecting the public safety;
(4) The degree of culpability indicated by the circumstances of the particular case; and
(5) The rehabilitative and treatment needs of the juvenile indicated by a risk and needs assessment.
This Court has recognized that "choosing between two appropriate dispositional levels is within the trial court's discretion. Absent an abuse of discretion, we will not disturb the trial court's choice." In re Robinson, 151 N.C. App. 733, 737, 567 S.E.2d 227, 229 (2002).
At the disposition hearing, the trial court received the juvenile court counselor's predisposition report, which noted that Respondent had received multiple in-school and out-of school suspensions. The report also noted that Respondent had been released from detention and approved to participate in a regular house arrest program on 21 November 2007; however, Respondent was detained on 1 February 2008 because he had been skipping school. As to his behavior at home, the predisposition report noted that Respondent's mother recently informed the juvenile court counselor that Respondent was "not following through with directives [and was] being disrespectful."
The trial court considered and gave weight to the predisposition report and the victim's testimony, and determined it was in the best interests of both the juvenile and the public for the juvenile to be committed to a youth development center. The trial court specifically found "[t]he offense was dangerous and community services would not be suitable to avoid repeat offense. Respondent does not seem to understand seriousness of charge and shows little remorse." Thus, before imposing a level three disposition, the trial court further considered the seriousness of the offenses, the juvenile's culpability, the need to hold the juvenile accountable for his actions, and the likelihood of the juvenile continuing to endanger the community. We find no abuse of discretion in the trial court's imposition of a level three disposition. This argument is without merit.
Finally, Respondent contends the recordation of juvenile proceedings is inadequate to protect his juvenile rights. Respondent asserts that he has been denied his due process rights because the transcript shows several instances as being inaudible. We disagree.
Recordation of hearings upon allegations that a juvenile is delinquent is governed by N.C. Gen. Stat. § 7B-2410 (2007), which provides:
[a]ll adjudicatory and dispositional hearings and hearings on probable cause and transfer to superior court shall be recorded by stenographic notes or by electronic or mechanical means. Records shall be reduced to a written transcript only when timely notice of appeal has been given. The court may order that other hearings be recorded.
Only where a trial transcript is "`entirely inaccurate and inadequate,' precluding formulation of an adequate record and thus preventing appropriate appellate review" would a new trial be required. In re Lineberry, 154 N.C. App. 246, 257, 572 S.E.2d 229, 237 (2002)(quoting State v. Sanders, 312 N.C. 318, 320, 321 S.E.2d 836, 837 (1984)). In Lineberry, this Court rejected respondent's assertion that the recordation of the juvenile court proceedings were inadequate to protect the respondent's juvenile rights where "`the transcript, despite its imperfections, [was] not so inaccurate as to prevent meaningful review by this Court.'" Id., (quoting State v. Hammonds, 141 N.C. App. 152, 168, 541 S.E.2d 166, 178 (2000), aff'd, 354 N.C. 353, 554 S.E.2d 645 (2001)). We hold the transcript was sufficient to provide for meaningful appellate review.
No error.
Judges TYSON and BRYANT concur.
Report per Rule 30(e).