IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-29

No. 20PA19-2

Filed 11 March 2022

STATE OF NORTH CAROLINA

v.

UTARIS MANDRELL REID

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 274 N.C. App. 100 (2020), reversing an order entered on 7 December 2018 by Judge C. Winston Gilchrist in Superior Court, Lee County. Heard in the Supreme Court on 5 January 2022.

*Joshua H. Stein, Attorney General, by Mary Carla Babb, Special Deputy Attorney General, for the State-appellee.*

*Lauren E. Miller for defendant-appellant.*

EARLS, Justice.

¶ 1   This case requires us to decide whether the Court of Appeals correctly held that the Superior Court, Lee County (MAR court) abused its discretion and committed legal error in granting defendant Utaris Mandrell Reid's motion for appropriate relief (MAR) and awarding him a new trial. Reid, who was fourteen years old when he was indicted for assaulting and robbing a cab driver who later died, was convicted of first-degree murder largely on the basis of a confession he made while being interrogated by a Sanford Police Department detective outside the presence of a parent or

guardian. Years later, Reid's postconviction counsel located a man who claimed that on the night of the crime, another person came to his home and confessed to assaulting the cab driver, exculpating Reid. Based on what it deemed to be this man's "credible and truthful testimony," the MAR court allowed Reid's MAR based on newly discovered evidence, vacated his conviction, and ordered a new trial. The Court of Appeals reversed the MAR court's order. *State v. Reid*, 274 N.C. App. 100, 133 (2020). Because we conclude that the MAR court neither abused its discretion nor committed legal error in granting Reid a new trial, we reverse the decision of the Court of Appeals, vacate Reid's conviction, and remand for a new trial.

## I.  Background

On the evening of 21 October 1995, John Graham was working as a driver for a taxicab company when he was assaulted and robbed. A police officer who arrived at the scene found Graham on the ground with severe head trauma. Graham was taken to the emergency room and remained hospitalized until he died from his injuries that December.

Two months after Graham was assaulted and robbed, an officer from the Sanford Police Department, Detective Jim Eads, interviewed fourteen-year-old Reid at the police station. Reid was read his *Miranda* rights and signed a waiver of his rights. The interview was not recorded, and no other person besides Detective Eads was present. According to Detective Eads, after he informed Reid that he was

interviewing him in connection with Graham's death, Reid replied, "I am not going down for this by myself" and, in a rambling confession, admitted to assaulting Graham with three other boys—Elliot McCormick, Duriel Shaw, and Anthony Reid. Detective Eads transcribed defendant Reid's statement, which Reid signed. Reid was subsequently indicted for first-degree murder and robbery with a dangerous weapon. The three juveniles named by Reid were also charged with murder, but all charges against them were ultimately dismissed.

¶ 4     Reid was initially tried in October 1996. At trial, Detective Eads testified that officers interviewed Graham in the emergency room after the assault, where Graham indicated that he had been assaulted by two black males between the ages of sixteen and nineteen. The State did not present any blood, fingerprint, or DNA evidence or any eyewitness testimony, and no weapon was ever recovered. The trial ended in a mistrial due to a hung jury.

¶ 5     On 21 July 1997, Reid was tried for a second time. At this trial, the State again presented Reid's transcribed confession. The State also again presented testimony from Detective Eads, who clarified that while Graham could not communicate "verbally" with officers when he was interviewed at the hospital, he did "attempt to shake his head, yes or no," which Detective Eads "took . . . as a response" "[i]n a fashion." Finally, the State presented testimony from John Love, one of Graham's coworkers, who stated that he came to the crime scene after hearing Graham radio

for help. According to Love, while Graham was lying injured, Love asked Graham who the perpetrators were, and Graham responded "L.L., McCormick, and Reid." Love explained that he did not report this information to officers who interviewed him at the crime scene because he "didn't put together" what Graham was talking about until after Reid's first trial.

¶ 6        Reid presented an alibi defense supported by testimony from family members who claimed he had spent the day the crime occurred in their presence. He also presented testimony from a neuropsychologist who examined Reid's transcribed confession and opined that it was written at a higher grade level than Reid functioned at. In addition, Reid filed a motion to suppress the transcribed confession. The trial court denied the motion, concluding that Reid "knowingly, willingly and understandingly" waived his rights and signed the confession prepared by Detective Eads.

¶ 7        Ultimately, Reid was convicted of first-degree murder and common law robbery. He was sentenced to life imprisonment without parole. On direct appeal, Reid argued that the trial court erred in denying his motion to suppress his confession. The Court of Appeals found no error, holding that "[w]hile a defendant's subnormal mental capacity is a factor to be considered in determining whether the defendant's waiver of rights is intelligent, knowing and voluntary, such lack of intelligence, standing alone, is insufficient to render a statement involuntary if the

circumstances otherwise indicate that the statement is voluntarily and intelligently made." *State v. Reid*, No. COA98-1392, slip op. at 4 (N.C. Ct. App. Oct. 19, 1999) (unpublished).

**A. The motion for appropriate relief.**

¶ 8    On 6 May 2011, Reid filed a MAR and motion for postconviction discovery asserting that his sentence of life imprisonment without parole was unconstitutional under the Eighth Amendment as interpreted by the United States Supreme Court in *Graham v. Florida*, 560 U.S. 48 (2010). His motion was summarily denied based on the determination that Reid had failed to allege a factual or legal basis upon which the MAR court could grant relief.

¶ 9    On 11 August 2011, Reid filed a motion for reconsideration of the trial court's order denying his MAR and motion for postconviction discovery. In support of this motion, Reid submitted an affidavit from William McCormick, a childhood friend of Reid's and the brother of Elliot McCormick, one of the juveniles Reid implicated in his confession, stating that: (1) on the night of the assault, William McCormick was at his mother's house with Reid; (2) Robert Shaw, Norman Cox, and Antonio Bristow came to McCormick's home "sweating and out of breath"; and (3) the next day, Shaw confessed to William McCormick that he, Cox, and Bristow had robbed and assaulted Graham. William McCormick stated that he "was not interviewed by the police or any attorneys involved in . . . Reid's case." On 8 February 2012, the MAR court granted

Reid's motion for postconviction discovery, noting that "[a]n evidentiary hearing on Defendant's Motion for Appropriate Relief and subsequent amendments may be held on a later date to be determined by the presiding judge."

¶ 10        On 5 April 2013, Reid filed another MAR again alleging that he was entitled to relief based on the newly discovered evidence of William McCormick's testimony. The MAR court held evidentiary hearings on this MAR on 20 July, 4 October, and 30 November 2017. At the hearings, the MAR court heard testimony from William McCormick, who conveyed his recollection of Shaw's confession. McCormick also explained that he refused to talk to anyone about Shaw's confession at the time of Reid's trial because he had been living by a "street code."

¶ 11        The MAR court also heard testimony from Reid's trial counsel, Fred Webb, who stated that as part of his initial investigation, "people that [he] knew in the street" mentioned William McCormick as a person who had information regarding Graham's death. Webb testified that based on this information, he moved for and obtained funds for an investigator to "[l]ocate and interview the brother and mother of . . . Elliot McCormick, and any other witness who may have heard or seen anything concerning the night of October 21, 1995." However, Webb explained that the investigator was ultimately unable to "get to [the McCormick brothers] in order to get a statement from them about what happened."

¶ 12          On 7 December 2018, the MAR court entered an order containing sixty-seven

findings of fact and eighteen conclusions of law granting Reid's MAR, vacating his

conviction for first-degree murder, and ordering a new trial. The MAR court explained

that having

> listened to the testimony and observed the demeanor of
> these witnesses, [it] finds that each gave credible and
> truthful testimony on every issue that was material to the
> findings of fact and conclusions of law which are necessary
> to reach a ruling on the issues raised in the instant matter.
> William McCormick was emotional during his testimony.
> His demeanor gave convincing force to his testimony.

Specifically, the MAR court found "[William] McCormick's testimony to be credible"

because, among other reasons, "McCormick in fact has no motive to testify for

Defendant other than to disclose the true facts known to him." With respect to the

credibility of McCormick's testimony, the MAR court noted its "emotional impact and

persuasive effect." With respect to the likely impact of William McCormick's

testimony on a jury, the MAR court found that this was "an extremely close case, tried

once to a hung jury, finally resulting in a conviction based largely on the purported

confession of the fourteen[-]year[-]old, mentally disabled Defendant."

¶ 13          On the basis of Reid's evidence and the testimony presented at the hearings,

the MAR court concluded that Reid had proven by a preponderance of the evidence

that William McCormick's testimony was "newly discovered evidence as defined by

law" because: (1) the evidence could not have been discovered or made available at

the time of Reid's trial despite counsel's "due diligence"; (2) the evidence had "a direct and material bearing upon [Reid's] guilt or innocence"; (3) the evidence was "probably true"; (4) the evidence was "competent, material[,] and relevant"; and (5) the evidence was likely to be admissible at trial under N.C.G.S. § 8C-1, Rules 803(24) and 804(b)(3). The State appealed pursuant to N.C.G.S. § 15A-1445(a)(2).[1]

**B. The Court of Appeals opinion.**

¶ 14     On appeal, the Court of Appeals reversed the MAR court's order. *State v. Reid*, 274 N.C. App. 100, 133 (2020). According to the Court of Appeals, the MAR court erred in concluding that Reid had proven by a preponderance of the evidence that McCormick's testimony was newly discovered evidence within the meaning of N.C.G.S. § 15A-1415(c). *Id.* at 128. In addressing this question, the Court of Appeals applied the seven-part test articulated by this Court in *State v. Beaver*:

> In order for a new trial to be granted on the ground of newly discovered evidence, it must appear by affidavit that (1) the witness or witnesses will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the new evidence does not merely tend to contradict, impeach or discredit the testimony of a former witness; and (7) the evidence is of such a nature that a different result will

---

[1] N.C.G.S. § 15A-1445(a)(2) provides that "the State may appeal from the superior court . . . [u]pon the granting of a motion for a new trial on the ground of newly discovered or newly available evidence *but only on questions of law*." N.C.G.S. § 15A-1445(a) (2021) (emphasis added).

probably be reached at a new trial.

*Id.* at 124 (quoting *State v. Beaver*, 291 N.C. 137, 143 (1976)). According to the Court of Appeals, Reid failed on multiple prongs of the *Beaver* test. *Id.* at 133.

¶ 15    First, the Court of Appeals held that Reid had failed to establish that William McCormick's recollection of Shaw's confession was probably true. *Id.* at 126. According to the Court of Appeals, there were numerous inconsistencies within William McCormick's affidavit and between the affidavit and his later testimony—such as William McCormick's conflicting accounts regarding when Shaw first told him about assaulting Graham, the time of night Shaw arrived at his home, and whether his mother was home or at work when Shaw arrived—that were "impossible to reconcile." *Id.* at 125–26. Thus, "[i]n light of McCormick's conflicting affidavit and inconsistent testimony, [Reid] failed to demonstrate by a preponderance of the evidence that the information provided by McCormick is probably true." *Id.* at 126.

¶ 16    Second, the Court of Appeals held that McCormick's testimony was not "unknown or unavailable to" Reid at the time of trial. *Id.* at 128 (quoting *State v. Wiggins*, 334 N.C. 18, 38 (1993)). The court reasoned that despite being aware William McCormick may have possessed information about Graham's death at the time of Reid's trial, Webb failed "to utilize available procedures to secure McCormick's statement or testimony," such as "(1) issu[ing] a subpoena, (2) request[ing] a material witness order, (3) request[ing] a recess, (4) mak[ing] a motion to continue,

(5) alert[ing] the trial court to the existence of this information, or (6) otherwise preserv[ing] this information in the record at trial." *Id*. at 127 (citing *State v. Smith*, 130 N.C. App. 71, 77 (1998)). Further, according to the Court of Appeals, William McCormick was "actually present at [Reid's] trial," but Webb "failed to speak with McCormick despite knowing that [he] may have information concerning Graham's death." *Id*. Therefore, the Court of Appeals concluded that Reid "failed to exercise due diligence in procuring McCormick's testimony" at trial. *Id*. at 129.

¶ 17          Third, the Court of Appeals held that the MAR court abused its discretion in concluding that McCormick's testimony was "competent, material[,] and relevant." *Id*. The Court of Appeals explained that under Rule 803(24), a party must give proper notice before offering hearsay testimony as evidence. *Id*. at 131. However, "there is no evidence in the record that [Reid] filed a proper notice of intent to offer hearsay evidence pursuant to Rule 803(24) prior to hearing the motion for appropriate relief." *Id*. at 132. Accordingly, the Court of Appeals concluded that "the [MAR] court abused its discretion when it concluded the written notice requirement had been satisfied." *Id*.

¶ 18          Finally, the Court of Appeals held that the MAR court erred in concluding that Reid's "due process rights would be violated if he were not allowed to present McCormick's testimony at a new trial." *Id*. According to the Court of Appeals, the proper way to decide whether due process requires the court to allow a defendant to

present new evidence is by applying the *Beaver* test "to determine whether to grant a new trial." *Id.* at 133. Based on its conclusion that Reid "has failed to satisfy the *Beaver* factors discussed above," the Court of Appeals held that "the [MAR] court erred in concluding that Defendant's constitutional rights would be violated if he did not have the opportunity to present the purported newly discovered evidence." *Id.*

In a brief concurring opinion, Judge Dietz agreed with the majority that Reid's trial counsel was aware "that William McCormick had information that implicated other people, but not Reid, in the crime" and that counsel's failure to exercise any of the "many options . . . in this situation to secure the testimony of [an] evasive witness" meant that McCormick's testimony was not, "when it finally came to light, newly discovered evidence under our post-conviction jurisprudence." *Id.* at 134 (Dietz, J., concurring). However, Judge Dietz expressed his view that "the failure to secure this testimony at the time of trial implicates Reid's constitutional right to the effective assistance of counsel," noting that the Court of Appeals' resolution of the case "does not bar Reid from seeking post-conviction relief on other grounds." *Id.* (Dietz, J., concurring).

Reid filed a petition for discretionary review, which was allowed by order of this Court in conference on 14 April 2021.

## II.   Standard of Review

Upon filing a MAR, the burden is on the moving party to prove "by a

preponderance of the evidence every fact essential to support the motion." *State v. Eason*, 328 N.C. 409, 434 (1991). "[A] new trial for newly discovered evidence should be granted with the utmost caution and only in a clear case, lest the courts should thereby encourage negligence or minister to the litigious passions of men." *State v. Davis*, 203 N.C. 316, 323 (cleaned up), *cert. denied*, 287 U.S. 668 (1932).

¶ 22        However, "[t]he decision of whether to grant a new trial in a criminal case on the ground of newly discovered evidence is within the trial court's discretion and is not subject to review absent a showing of an abuse of discretion." *State v. Rhodes*, 366 N.C. 532, 535 (2013) (quoting *Wiggins*, 334 N.C. at 38). In general, "[a]ppellate courts review trial court orders deciding motions for appropriate relief 'to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court.'" *State v. Hyman*, 371 N.C. 363, 382 (2018) (quoting *State v. Frogge*, 359 N.C. 228, 240 (2005)). "[T]he trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *Id.* (alteration in original) (quoting *State v. Buchanan*, 353 N.C. 332, 336 (2001)). A MAR court abuses its discretion only if its ruling was "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777 (1985).

## III.    Analysis

¶ 23        Both parties agree that, as a general matter, the *Beaver* test governs when

assessing whether a defendant is entitled to a new trial on the basis of newly discovered evidence. The parties disagree as to whether the Court of Appeals properly applied the test in this case.

¶ 24        Reid contends that the Court of Appeals usurped the role of the MAR court when it "looked beyond the [MAR] court's supported [factual] findings" and reweighed the evidence based on its own assessment of the relative credibility of the witnesses who testified at the evidentiary hearing. According to Reid, the MAR court's threshold determination that William McCormick's account of Shaw's confession was "probably true" is a "factual determination" that is binding on appeal because it was supported by "ample" evidence in the record. Further, Reid argues that the Court of Appeals erred in concluding that his trial counsel did not exercise due diligence in attempting to elicit William McCormick's testimony and in concluding that this evidence was not "competent" because it was inadmissible.

¶ 25        In response, the State contends that the Court of Appeals appropriately concluded Reid failed to satisfy the "rigorous" and "difficult-to-meet" *Beaver* test. In the State's view, the MAR court's determination that William McCormick's affidavit and testimony were probably true "is a conclusion of law, or at the very least, a mixed finding of fact and conclusion of law, reviewable de novo on appeal." Further, the State argues that the Court of Appeals correctly concluded that Reid did not "carry [the] very heavy burden . . . [of] establishing the exercise of due diligence" in seeking

William McCormick's testimony at trial and that the MAR court abused its discretion in concluding that his testimony was material, competent, and relevant.

¶ 26      We agree with Reid that the Court of Appeals overstepped in displacing the MAR court's finding that William McCormick's recollection of Shaw's confession was probably true, a factual determination that was supported by evidence in the record. In addition, the MAR court did not commit any error of law in its application of the *Beaver* test and did not abuse its discretion in concluding that Reid was entitled to a new trial on the basis of newly discovered evidence. Accordingly, we reverse the decision of the Court of Appeals.

**A. What is probably true is a question of fact.**

¶ 27      In order to demonstrate that he was entitled to a new trial, Reid was required to establish that William McCormick's recollection of Shaw's confession was "probably true." *Beaver*, 291 N.C. at 143. To determine if McCormick's testimony was probably true, the MAR court needed to "weigh evidence, assess witness credibility, assign probative value to the evidence and testimony, and determine what the evidence proves or fails to prove." *State v. Moore*, 366 N.C. 100, 108 (2012). These are all tasks that can only be performed by the factfinder, who "sees the witnesses, observes their demeanor as they testify and . . . is given the responsibility of discovering the truth." *State v. Cooke*, 306 N.C. 132, 135 (1982) (quoting *State v. Smith*, 278 N.C. 36, 41 (1971)). Determining whether evidence is probably true

requires the factfinder to perform its quintessential functions to "discover[ ] the truth," *id.*; thus, determining whether evidence is probably true is a factual question to be resolved by the MAR court.

The Court of Appeals held that the MAR court erred in determining that Reid's evidence was probably true because there were some inconsistencies internal to William McCormick's affidavit and discrepancies between his affidavit and subsequent testimony at the evidentiary hearing. But, as the State correctly acknowledges, "inconsistencies and conflicts in the evidence do not render a trial court's findings of fact unsupported by evidence and reviewable on appeal." Rather, as we have repeatedly emphasized, the fact that evidence presented to a MAR court is conflicting or contains discrepancies is not a reason for an appellate court to disregard the MAR court's factual findings based on that evidence. *See, e.g.*, *State v. Allen*, 378 N.C. 286, 2021-NCSC-88, ¶ 24 ("The MAR court's factual findings are binding . . . if they are supported by evidence, even if the evidence is conflicting." (cleaned up)). Indeed, the factfinder's function is to "resolve" any "[c]ontradictions and discrepancies" appearing in the evidence. *State v. McDaniel*, 372 N.C. 594, 603 (2019). On appeal, the reviewing court's only role, "even [if] the evidence is conflicting," is to "determine whether the findings of fact are supported by evidence." *State v. Stevens*, 305 N.C. 712, 720 (1982). Whatever inconsistencies there might be in Reid's evidence did not give the Court of Appeals license to replace the MAR court's facts with its

own.

¶ 29        In order for the MAR court to determine that it was probably true Shaw had confessed to William McCormick, the court needed to find that McCormick was credible. That is precisely what the MAR court did: it entered numerous findings of fact specifically detailing the basis for its determination that McCormick was a credible witness, which included its own observations of McCormick's demeanor, his reasons for not coming forward near the time of Graham's death, his lack of any motivation to lie, and his maturation since his brother was murdered in 2000. A different factfinder might have assessed McCormick's credibility differently, but we cannot say that the MAR court's findings concerning McCormick's credibility were unsupported by the evidence. Thus, the MAR court's determination that McCormick was credible could not be displaced on appeal.

¶ 30        Reid bore the burden of proving by a preponderance of the evidence that McCormick's affidavit and testimony were probably true. Notwithstanding the Court of Appeals' suggestion to the contrary, this burden did not require him to "reconcile the discrepancies in the information provided by McCormick." *Reid*, 274 N.C. App. at 126. A trial court is entitled to "believe all that a witness testified to, or to believe nothing that a witness testified to, or to believe part of the testimony and to disbelieve part of it." *Brown v. Brown*, 264 N.C. 485, 488 (1965). Evidence that contains inconsistencies can still support a factual finding based upon the factfinder's

assessment of the evidence and the credibility of its proponents. If it were otherwise—if only evidence without any discrepancies or inconsistencies could support a trial court's factual findings—our precedents instructing appellate courts to defer to the trial court's findings when the evidence is conflicting would be nonsensical.

Rather than defer to the MAR court's factual findings which were supported by evidence in the record, "the Court of Appeals engaged in the prohibited exercises of reweighing evidence and making witness credibility determinations, essentially making its own findings of fact in several areas where evidence presented to the [MAR court] was conflicting." *Brackett v. Thomas*, 371 N.C. 121, 127 (2018). Accordingly, the Court of Appeals erred in overruling the MAR court's determination that Reid had proven by a preponderance of the evidence that William McCormick's account of Shaw's confession was probably true.

**B. The exercise of due diligence at trial.**

The Court of Appeals also held that the MAR court abused its discretion in granting Reid a new trial because Reid had failed to prove by a preponderance of the evidence that "due diligence was used and proper means were employed to procure the testimony [being offered in support of his MAR] at trial." *Beaver*, 291 N.C. at 143; *see also* N.C.G.S. § 15A-1415(c) (2021). The MAR court entered two relevant findings of fact in support of its conclusion that Reid's trial counsel had exercised due diligence in attempting to procure William McCormick's testimony:

63. Before trial, Attorney Webb spoke to contacts "in the street" who had provided information that led him to believe Defendant was not involved in the crime. The names of the McCormick brothers, William and Elliott, came up as witnesses who had information that could be helpful to the defense. Attorney Webb moved for and secured funds to retain Investigator Mel Palmer for the specific purpose of locating and interviewing William McCormick. In the motions and orders for investigator funding, Attorney Webb specified that he was trying to locate William McCormick.

64. Investigator Palmer attempted to interview William McCormick, but was unable to locate him. Investigator Palmer made attempts to serve William McCormick with a subpoena but was unable to do so. McCormick's mother interfered with the investigator's efforts to locate William and would not allow him to be interviewed.

These findings of fact are supported by the evidence and binding on appeal.

¶ 33    The due diligence requirement does not demand that a defendant do everything imaginable to procure at trial the purportedly newly discovered evidence presented in a MAR. Rather, it requires the defendant to prove that he or she "could not, with *reasonable* diligence, have discovered and produced the evidence at the trial." *Beaver*, 291 N.C. at 143 (emphasis added); *see also Due Diligence*, Black's Law Dictionary (11th ed. 2019) (defining due diligence as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation"). We have explained that "[w]hen the information presented by the purported newly discovered evidence was *known or available* to the defendant at the time of trial, the evidence does not meet the

requirements of N.C.G.S. § 15A-1415(c)." *State v. Rhodes*, 366 N.C. 532, 537 (2013) (emphasis added).

¶ 34    In this case, the MAR court did not commit legal error or abuse its discretion in concluding that William McCormick's testimony was neither known nor available to Reid or his counsel, Webb, at the time of trial. Neither Reid nor Webb knew that Shaw had confessed regarding his role in the murder to William McCormick; at most, Webb knew that his contacts "in the street" had identified William McCormick as someone who might possess information that could potentially benefit Reid. He had no knowledge of and no reason to know what that information was, or even whether it existed, at the time of trial. And William McCormick was decidedly not "available" to Reid and Webb; despite repeated efforts, the investigator hired by Webb was unable to locate William McCormick in order to interview him and ascertain what information McCormick possessed.[2]

¶ 35    Nevertheless, the Court of Appeals concluded that Reid and his counsel "failed to exercise due diligence in procuring McCormick's testimony." *Reid*, 274 N.C. App. at 129. As recounted above, the rationale for this conclusion was that Webb "could

---

[2] Further, the State concedes that the MAR court made no finding—and there is no testimony in the record—supporting the Court of Appeals' assertion that Webb knew William McCormick was "actually present at [Reid's] trial." At most, there is testimony indicating that Webb saw William McCormick's family in the courthouse on one occasion but they "refused to even talk to [Webb]" and testimony indicating that William McCormick saw Reid in the courthouse on some unspecified occasion. The Court of Appeals exceeded its proper role as an appellate court in asserting the existence of a fact not found by the MAR court based on vague and ambiguous record evidence.

have secured McCormick's attendance to testify at trial" by, for example, issuing a subpoena or requesting a material witness order. *Id.* at 127. But the question is not whether there was any possible existing procedural mechanism by which Webb *could* have secured McCormick's appearance at trial; the question is whether utilizing any of these mechanisms would have been "reasonably expected" of someone who possessed the information Webb possessed. Judged against this standard, we disagree with the State that Webb's failure to issue a subpoena or request a material witness order means that the MAR court committed legal error or abused its discretion in determining that Webb exercised due diligence.

¶ 36    Due diligence does not require counsel to take speculative risks on the basis of rumors. Having only heard intimations that William McCormick possessed information that might have benefited his client—but having not been able to interview McCormick and having no insight into the substance of the information McCormick may (or, as far as Webb knew, may not) have possessed—it would not have been reasonably expected of Webb to subpoena William McCormick to testify at trial. *Cf. Gatling v. Commonwealth*, 14 Va. App. 60, 63 (1992) ("[I]t is unreasonable to require, as an exercise of due diligence, that defense counsel call to the witness stand a witness as to whose testimony he is uninformed."). Similarly, it would not have been reasonably expected of Webb to submit an affidavit swearing that William McCormick "possesse[d] information material to the determination of the

proceeding," given that he did not know what (if any) information McCormick possessed. N.C.G.S. § 15A-803(a) (2021). Finally, given that Webb had already tried and failed to locate William McCormick for an interview on multiple occasions, it would not have been reasonably expected of Webb to utilize any of the other procedural options identified by the Court of Appeals, such as requesting a recess or moving for a continuance. On the basis of the information Webb possessed at the time of trial, his actions in obtaining funding to hire an investigator who repeatedly attempted to locate and interview William McCormick constituted due diligence.

¶ 37      The facts of this case are distinguishable from the facts of prior cases in which this Court has held that a defendant failed to exercise due diligence at trial. For example, in *Beaver*, a defendant who was convicted of burglary asserted in a postconviction MAR that "while the jury deliberated" he learned detectives had located his former roommate, who would have testified that the defendant was living at the house he supposedly burglarized on the night the crime was committed. 291 N.C. at 142. This Court concluded that the MAR court did not abuse its discretion in denying the defendant's MAR because (1) the defendant himself testified at trial to the same facts the roommate would have presented; (2) the detectives who located the former roommate testified at trial and were available to be cross-examined by the defendant; and (3) the defendant knew the substance of the information the roommate would have testified to if he had been called at trial. Thus, the defendant

"*should* have filed an affidavit before trial so stating and moved for a continuance to enable him to locate this witness." *Id.* at 144 (emphasis added). By contrast, in this case, no other witness who had knowledge of Shaw's confession testified at trial, no person who knew where William McCormick could be found testified at trial, and Webb was unaware of what information McCormick would have disclosed had he been located and compelled to testify.

¶ 38          Similarly, in *State v. Powell*, a defendant who was convicted of rape filed a MAR on the basis of newly discovered evidence in the form of testimony from a woman who witnessed the defendant walking "hand in hand" with the victim around the time of the alleged crime. 321 N.C. 364, 370 (1988). This Court concluded that the woman's testimony was not newly discovered evidence because the defendant's attorney "examined [the special agent's] notes during the trial, at which time he learned of [the woman's] statement and [yet] he did not ask for a recess for the purpose of procuring [the woman] as a witness." *Id*. Because "[t]he evidence showed that the defendant *knew* of the statement of [the woman] during the trial," it was not an abuse of discretion to deny his MAR. *Id*. at 371 (emphasis added). By contrast, in this case, Reid and Webb did not learn Shaw confessed to William McCormick until an investigator was able to locate and interview McCormick many years after trial.

¶ 39          Most recently, in *Rhodes*, a defendant who was convicted of various drug offenses claimed he was entitled to a new trial on the basis of newly discovered

evidence in the form of an affidavit alleging that the defendant had learned that "after the trial, [the defendant's father] told a probation officer that the contraband belonged to him." 366 N.C. at 534. However, the defendant had himself testified at trial and offered "no testimony regarding the ownership of the drugs." *Id.* at 538. In addition, although the defendant's father had invoked his Fifth Amendment right to avoid self-incriminating testimony when asked if he owned the drugs at trial, the defendant "did not pursue a line of questioning about whether the drugs belonged to [the defendant's father]" on direct examination of the defendant's mother, who co-owned with the defendant's father the home where the contraband was found. *Id.* Accordingly, we concluded that the defendant had failed to make the requisite "showing of due diligence" at trial. *Id.* By contrast, in this case, Reid had no way of knowing the substance of the information forming the basis of his MAR at the time of trial, and no person who did know such information testified.

¶ 40        Accordingly, on the facts as determined by the MAR court, the MAR court did not err as a matter of law or abuse its discretion in concluding that Reid had exercised due diligence in attempting to procure William McCormick's testimony at trial. Because neither Reid nor his counsel knew whether William McCormick actually possessed any information about Graham's killing, let alone whether that information would have benefitted Reid's case—and because Webb undertook proactive efforts to locate and interview McCormick before trial—Webb could not

have been reasonably expected to utilize any of the additional procedural mechanisms identified by the Court of Appeals to compel McCormick's appearance at trial. As our precedents illustrate, on a different set of facts it might have been reasonably expected that Webb would do something more than hiring an investigator to try to interview William McCormick; however, on this set of facts, we conclude that the MAR court did not err as a matter of law or abuse its discretion in concluding that Webb exercised due diligence.

**C. Material, competent, and relevant evidence.**

¶ 41        The Court of Appeals held that the MAR court abused its discretion in concluding that William McCormick's testimony was "competent" evidence because it was inadmissible hearsay. *Reid*, 274 N.C. App. at 129. As explained above, the sole basis for this conclusion was that Reid had failed to "file[ ] a proper notice of intent to offer hearsay evidence pursuant to Rule 803(24) prior to hearing the motion for appropriate relief." *Id.* at 132. Although the Court of Appeals was correct that Reid bore the burden of proving that the evidence he presented in support of his MAR was "material, competent[,] and relevant," *Beaver*, 291 N.C. at 143, the Court of Appeals' analysis misses the mark for two reasons.

¶ 42        First, if the Court of Appeals is correct that evidence in support of a MAR is competent if it is admissible at the evidentiary hearing on the MAR, then the Court of Appeals erred in concluding that McCormick's testimony was inadmissible for lack

of proper notice. In its reply brief at the Court of Appeals, the State conceded that it "did not object at the time defendant offered McCormick's testimony at the MAR hearing" and thus "waived appellate review of the MAR court's . . . admission of McCormick's testimony at the MAR hearing by not objecting." In its brief at this Court, the State concedes that it "knew McCormick would testify [at the MAR hearing] and did not object to his testimony." Evidence that is admitted without objection is competent evidence. *See State v. Bryant*, 235 N.C. 420, 423 (1952) ("While some of the evidence offered by the State might have been excluded as hearsay, it was admitted without objection, and hence . . . may be considered with the other evidence and given such evidentiary value as it properly may possess." (citation omitted)). Thus, if the test for competence is admissibility at the MAR hearing, the Court of Appeals erred in concluding that McCormick's testimony was not competent evidence.

¶ 43        Regardless, we disagree with the Court of Appeals that admissibility at the MAR hearing is the test for competence. Rather, courts assess whether evidence would be material, competent, and relevant *in a future trial* if the defendant's MAR were granted in order to determine whether a new trial is warranted. *See, e.g.*, *State v. Nickerson*, 320 N.C. 603, 609–10 (1987) ("The rule for newly discovered evidence is that *in order for a new trial to be granted . . . .*" (emphasis added)). Applying the proper test for competence, we conclude that the MAR court did not commit legal error or abuse its discretion in determining that McCormick's testimony would have been

admissible under the residual exception, Rule 803(24).

¶ 44      The residual exception provides for the admission of "[a] statement not specifically covered by any" other hearsay exception but "having equivalent circumstantial guarantees of trustworthiness." N.C.G.S. § 8C-1, Rule 803(24) (2021). In order for evidence to be admissible under Rule 803(24), a court must make findings addressing the following six factors:

> (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 518 (2003). We have deemed the third factor, whether the testimony was trustworthy, the "most significant requirement." *State v. Smith*, 315 N.C. 76, 93 (1985). "When assessing trustworthiness, a court considers the following, non-exhaustive set of factors: '(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination.' " *State v. Corbett*, 376 N.C. 799, 2021-NCSC-18, ¶ 41 (quoting *State v. Triplett*, 316 N.C. 1, 10–11 (1986)). "A trial court's determination as to the admissibility of hearsay statements pursuant to Rule 803(24) is reviewed for abuse of discretion." *Id.* ¶ 40.

¶ 45        In this case, the MAR court entered findings corresponding to all six admissibility factors:

> After careful scrutiny, the court concludes that the testimony of William McCormick about Robert Shaw's statement regarding the details of Shaw, Bristow and Cox assaulting the victim is admissible evidence under Rule 803(24). First, the State is on notice that Defendant would offer such evidence at trial. Second, this hearsay evidence is not specifically covered by any other exception in Rule 803. Third, the evidence possesses circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions because it constitutes an admission of criminal conduct by Shaw, is consistent with events actually observed by William McCormick the day before, when Shaw and the other youths arrived at McCormick's house out of breath having jumped and run from a cab, and is consistent with known circumstances of the case, including that the victim was assaulted by more than one young male person. Fourth, the evidence is material to the case. Fifth, the evidence is more probative on the issue of whether Shaw, Bristow and Cox, rather than Defendant, were the actual perpetrators of these crimes than any other evidence procurable by reasonable efforts. Defendant cannot reasonably be expected to procure the in-court confession of Shaw that Shaw himself is guilty of robbery and first degree murder. Sixth, admission of the evidence of Shaw's statements will best serve the purposes of the Rules of Evidence and the interests of justice.

Further, with respect to the third factor, the MAR court specifically found that "(1) Shaw had personal knowledge of the events described; (2) Shaw had a strong motivation to confide the truth to his friend William McCormick and no reason to claim false responsibility for such serious acts which could expose him to criminal liability; and (3) there is no evidence that Shaw ever recanted his statement."

¶ 46 According to the State, these findings were insufficient to support the MAR court's conclusion that the evidence was admissible because "[t]here was no independent, non-hearsay evidence connecting Shaw, Cox, or Bristow to Graham's murder." However, we have never held that a trial court lacks the discretion to find hearsay evidence trustworthy in the absence of independent non-hearsay corroborating evidence. Rather, as we explained in the related context of examining the scope of the hearsay exception for declarations against penal interest, "the precise application of the standards of reliability must be left to the discretion of the trial judge." *State v. Haywood*, 295 N.C. 709, 729 (1978). In view of these findings, the MAR court's determination that McCormick's testimony was sufficiently trustworthy and admissible under the residual exception was not "manifestly unsupported by reason . . . [or] so arbitrary that it could not have been the result of a reasoned decision." *White*, 312 N.C. at 777.

**D. Other claims that the MAR court abused its discretion.**

¶ 47 In addition to the purported deficiencies in the MAR court's reasoning identified by the Court of Appeals, the State also argues before this Court that the MAR court abused its discretion in granting Reid a new trial because Reid "failed to establish McCormick's testimony showed that a different result would probably be reached at a new trial." Reid bore the burden of proving by a preponderance of the evidence that his newly discovered evidence was "of such a nature that a different

result will probably be reached at a new trial." *Beaver*, 291 N.C. at 143. In this case,

the MAR court concluded that

> [t]he newly discovered evidence is of such a nature as to show that [i]n another trial a different result will probably be reached . . . . This was an extremely close case, tried once to a hung jury, finally resulting in a conviction based largely on the purported confession of the fourteen-year-old, mentally disabled Defendant. No physical evidence connected Defendant to the case, and alibi evidence was offered. The addition of credible testimony from William McCormick will probably result in a different outcome than that reached in the original trial.
>
> . . . The testimony of William McCormick points directly to the guilt of specific persons and is inconsistent with Defendant's guilt.

¶ 48        The State takes issue with the MAR court's characterization of Reid's

confession as "purported" in light of the Court of Appeals resolution of Reid's direct

appeal, where the court held that his confession was admissible at trial. *See State v.

Reid*, No. COA98-1392, slip op. at 4 (N.C. Ct. App. Oct. 19, 1999) (unpublished). We

agree with the State that for the purposes of this appeal, Reid's confession was validly

obtained and properly admitted. However, the State is wrong to suggest that because

Reid's confession has been established to be admissible, any potential impact of

McCormick's testimony at trial is automatically negated.

¶ 49        The question of how much probative weight to give a confession in determining

a defendant's guilt is distinct from the question of whether the confession is

admissible, and a factfinder is entitled to consider the circumstances surrounding a

confession even after the confession has been admitted. *State v. Roache*, 358 N.C. 243, 286 (2004) (explaining that evidence was properly admitted because it "lent credibility" to a defendant's confession); *see also Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("[T]he physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt."). Indeed, even after a trial court has denied a defendant's motion to suppress a confession, a defendant possesses a constitutional right to admit evidence regarding the circumstances surrounding the confession. *Crane*, 476 U.S. at 690. In this case, the unrecorded confession was elicited from a fourteen-year-old child with intellectual deficiencies who was interviewed in a police station outside the presence of a parent or guardian. There was no physical evidence, and limited corroborating evidence, connecting Reid to the crime scene. As the initial mistrial due to a hung jury illustrates, the evidence of Reid's guilt was not overwhelming. Accordingly, the MAR court did not abuse its discretion in determining that "a different result w[ould] probably be reached at a new trial" if McCormick's testimony were admitted. *Beaver*, 291 N.C. at 143.

## IV. Conclusion

After a defendant has been convicted by a jury of his or her peers, the defendant "has the laboring oar to rebut the presumption that the verdict is correct." *State v.*

*Casey*, 201 N.C. 620, 624 (1931). However, in this case, the MAR court did not abuse its discretion or commit legal error in concluding that Reid met his burden of proving by a preponderance of the evidence all elements necessary to demonstrate his entitlement to a new trial on the basis of newly discovered evidence. Accordingly, we reverse the decision of the Court of Appeals.

REVERSED.

Justice BERGER did not participate in the consideration or decision of this case.

Chief Justice NEWBY dissenting.

"[A] new trial for newly discovered evidence should be granted with the utmost caution and only in a clear case, lest the courts should thereby encourage negligence or minister to the litigious passions of men." *State v. Rhodes*, 366 N.C. 532, 536, 743 S.E.2d 37, 40 (2013) (alteration in original) (quoting *State v. Davis*, 203 N.C. 316, 323, 166 S.E. 292, 296 (1932)). "The defendant 'has the laboring oar to rebut the presumption that the verdict is correct and that he has not exercised due diligence in preparing for trial.'" *Id.* at 537, 743 S.E.2d at 40 (quoting *State v. Casey*, 201 N.C. 620, 624, 161 S.E. 81, 83 (1931)). "Under the rule as codified, the defendant has the burden of proving that the new evidence 'could not with due diligence have been discovered or made available at [the time of trial].'" *Id.* (alteration in original) (quoting N.C.G.S. § 15A-1415(c) (2011)); *see* N.C.G.S. § 15A-1420(c)(5), (6) (2021). Because the majority ignores these fundamental principles and significantly lowers the standard for "newly discovered evidence," I respectfully dissent.

Defendant has the burden to rebut the presumption that the evidence in question could not have been discovered by due diligence before the trial. Due diligence is "diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Due Diligence*, *Black's Law Dictionary* (11th ed. 2019). "When the information presented by the purported newly discovered evidence was known or available to the defendant at the

time of trial," but the defendant fails to procure the information, due diligence was not exercised, and "the evidence [thus] does not meet the requirements of N.C.G.S. § 15A-1415(c)." *Rhodes*, 366 N.C. at 537, 743 S.E.2d at 40; *see State v. Beaver*, 291 N.C. 137, 144, 229 S.E.2d 179, 183 (1976); *State v. Powell*, 321 N.C. 364, 371, 364 S.E.2d 332, 336 (1988).

¶ 53        Three cases should control our analysis. In *Beaver* the defendant was convicted of first-degree burglary and later filed a motion for a new trial on the basis of newly discovered evidence. *Beaver*, 291 N.C. at 142, 229 S.E.2d at 182. The defendant argued that he was entitled to a new trial because the State concealed the whereabouts of a witness who could testify that the defendant was a resident of the house he allegedly burglarized. *Id.* The trial court denied the motion. *Id.* On appeal, this Court noted that the defendant had ample opportunity to examine the detectives who allegedly knew the witness's location but failed to do so. *Id.* at 144, 229 S.E.2d at 183. We also reasoned that "if [the] defendant considered [the witness] an important and material witness, he should have filed an affidavit before trial so stating and moved for a continuance to enable him to locate this witness." *Id.* Since the defendant failed to take such action, we concluded that he did not exercise due diligence in procuring the witness's testimony. *Id.* As such, we upheld the trial court's denial of the defendant's motion for a new trial. *Id.*

¶ 54        Similarly, in *Powell* the defendant filed a motion for appropriate relief (MAR)

with the trial court seeking to overturn his conviction of first-degree rape. *Powell*, 321 N.C. at 370, 364 S.E.2d at 336. There the victim testified that while she was sitting on the beach in Kitty Hawk, the defendant approached her, drew a knife, forced her into a dune, and raped her. *Id.* at 366, 364 S.E.2d at 334. During the trial, the defendant's counsel inspected notes that a special agent with the State Bureau of Investigation had made throughout his investigation of the incident. *Id.* at 370, 364 S.E.2d at 336. The notes showed that a witness to the incident informed the special agent that she had observed through binoculars a male and female enter the dunes and leave approximately twenty minutes later hand in hand. *Id.* Despite having access to this material information, the defendant's counsel never called the witness to testify at trial. *Id.* As such, when the defendant filed a post-conviction MAR arguing that the witness's statement to the special agent constituted newly discovered evidence, the trial court denied the motion, concluding that the defendant failed to exercise due diligence in procuring the witness's testimony. *Id.* On appeal, since the defendant's counsel was aware of the witness's statement but failed to procure her testimony, this Court upheld the trial court's denial of the MAR. *Id.* at 371, 364 S.E.2d at 336.

¶ 55        A defendant also fails to exercise due diligence where a witness refuses to testify to material information, but the information could have been discovered through pursuing a different line of questioning or speaking to other witnesses. *See*

*Rhodes*, 366 N.C. at 537–38, 743 S.E.2d at 40–41. In *Rhodes* the defendant and his father were the subjects of a search warrant. *Id.* at 533, 743 S.E.2d at 38. When police executed the warrant at the defendant's residence, they found the defendant and his mother downstairs. *Id.* After the officers found drugs and paraphernalia at the residence, the defendant was charged with possession with intent to manufacture, sell, or deliver cocaine and possession of drug paraphernalia. *Id.* at 534, 743 S.E.2d at 38. At trial the defense presented testimony by the defendant, his mother, and his father. *Id.* The defendant's mother testified that the drugs did not belong to the defendant, but the defendant's counsel did not pursue a line of questioning regarding whether the drugs belonged to the defendant's father. *Id.* The defendant's father also testified that the drugs did not belong to the defendant. *Id.* When the defendant's father was asked whether the drugs belonged to him, however, he invoked his Fifth Amendment privilege against self-incrimination. *Id.* Lastly, the defendant testified to facts concerning the execution of the search warrant, but the defendant's counsel never asked the defendant about the ownership of the contraband. *Id.* The jury found the defendant guilty of the drug offenses. *Id.*

¶ 56        The defendant later filed a MAR based upon the theory of newly discovered evidence. *Id.* The defendant alleged that after the conclusion of the trial, the defendant's father told a probation officer that the contraband belonged to him. *Id.* The trial court concluded that due diligence was used to procure the testimony at

trial, set aside the defendant's conviction, and awarded a new trial. *Id.* at 535, 743 S.E.2d at 38–39. On appeal, this Court explained that despite the defendant's father's refusal to testify to the true ownership of the drugs, the information could have been made available by other means. *Id.* at 538, 743 S.E.2d at 40. We specifically noted that on direct examination of the defendant's mother, the defendant failed to pursue a line of questioning about whether the drugs belonged to the defendant's father and that the defendant gave no testimony regarding the ownership of the drugs. *Id.* Therefore, we held that the trial court erred in concluding as a matter of law that due diligence was used to procure the information. *Id.* Accordingly, we reversed the decision of the Court of Appeals which affirmed the trial court's decision to award the defendant a new trial. *Id.* at 533, 743 S.E.2d at 38.

¶ 57        Like the defendants in *Beaver*, *Powell*, and *Rhodes*, defendant here failed to take reasonable action to procure the evidence that he now deems "newly discovered." Defendant's trial counsel, Fred Webb, believed that William McCormick likely had information that could exculpate defendant. When asked at the MAR hearing whether he made any effort to locate McCormick during his pretrial investigation, Webb responded as follows:

> Yes, we did. I got contact through some of the people that I knew in the street who had brought up the names of other guys that they thought had done it, and they had indicated to me that they didn't think [defendant] was the one that did it and that it was – the McCormick names popped up in those conversations.

>After that, I talked with [the investigator] and explained to him that I needed him to locate the McCormick kids, but I told him also it's going to be difficult because I knew the McCormick kids' mother and I had heard that she was protecting them and keeping them from – keeping them not being available so people could talk to them.

>I approached her once down in the lower lobby of the courthouse in an effort to try to talk with them, and they refused to even talk to me.

¶ 58     The majority opines that Webb's mere hiring of a private investigator to locate McCormick establishes the exercise of due diligence. According to the majority, since Webb did not specifically know about Shaw's confession to McCormick, he should not have been expected to conduct further inquiry after McCormick's mother prevented Webb from speaking with him. Whether Webb specifically knew about Shaw's alleged confession to McCormick is not the question. Instead, the question is whether Webb exercised due diligence as defined by our cases after being told that McCormick had information that would likely help his client.

¶ 59     The record evidence indicates that Webb's efforts were not reasonable. Though Webb hired a private investigator, McCormick's mother prevented the investigator from speaking with McCormick. Webb then ceased his investigatory efforts when he realized that circumventing McCormick's mother was "going to be difficult." But difficulty in obtaining information does not make that information unavailable. As our cases indicate, due diligence required more. The defense attorney should have

sought some form of relief from the trial court in an effort to speak to McCormick or should have further questioned other witnesses about the identity of the murderers. As we explained in *Beaver*, "if defendant considered [McCormick] an important and material witness, he should have filed an affidavit before trial so stating." *Beaver*, 291 N.C. at 144, 229 S.E.2d at 183.

Further, our General Statutes provide several mechanisms for eliciting material information from a reluctant witness. For example, "[t]he presence of a person as a witness in a criminal proceeding may be obtained by subpoena." N.C.G.S. § 15A-801 (2021). And,

> [a] judge may issue an order assuring the attendance of a material witness at a criminal proceeding. This material witness order may be issued when there are reasonable grounds to believe that the person whom the State or a defendant desires to call as a witness in a pending criminal proceeding possesses information material to the determination of the proceeding and may not be amenable or responsive to a subpoena at a time when his attendance will be sought.
>
> . . . .
>
>     . . . A material witness order may be obtained upon motion supported by affidavit showing cause for its issuance.

*Id.* § 15A-803(a), (d) (2021). Webb knew McCormick's address and even approached McCormick and his mother in the courthouse. Despite Webb's belief that McCormick possessed exculpatory information, however, he did not seek any form of relief from

the trial court or otherwise. Had Webb gone to the trial court for assistance, he likely could have gained access to McCormick and elicited his testimony.

¶ 61 Webb also could have discovered the relevant information by speaking to other witnesses or further questioning those he had already interviewed. For example, McCormick's brother likely had the same information as McCormick. Nonetheless, it does not appear that Webb or the private investigator attempted to speak with McCormick's brother or his attorney.

¶ 62 Further, Webb's testimony demonstrates that he spoke with several unnamed potential witnesses that had information related to the identity of the murderers. Webb, however, never explained the basis for these potential witnesses' belief that defendant was innocent nor had them testify at trial. If Webb knew these potential witnesses believed defendant was innocent and had information implicating other perpetrators, then Webb had an obligation to further investigate the extent of their knowledge. For example, Webb could have inquired into the identities and locations of the "other guys that [the potential witnesses] thought had done it." Instead, it appears that for reasons of his own, Webb declined to pursue these leads. Due diligence required Webb to conduct further investigation where he likely could have discovered the information that defendant now classifies as newly discovered.

¶ 63 Just as the identity of the true owner of the drugs was available to the defendant in *Rhodes* and just as the eyewitness testimony contained in the notes was

available to the defendant in *Powell*, the fact that McCormick had possibly exculpatory information was available to defendant in the present case. As such, based upon our prior decisions, McCormick's testimony at the MAR hearing does not constitute newly discovered evidence. *See Beaver*, 291 N.C. at 144, 229 S.E.2d at 183; *Powell*, 321 N.C. at 371, 364 S.E.2d at 336; *Rhodes*, 366 N.C. at 538, 743 S.E.2d at 40. Nonetheless, the majority now lowers the due diligence bar, allowing a defendant to decline to interview a witness he believed to be material and to later file a MAR asserting that the witness's testimony is newly discovered.

¶ 64        In summary, our case law presumes that an underlying verdict is correct. When a defendant seeks a new trial based upon newly discovered evidence, there is a presumption that the defendant did not exercise due diligence in preparing for trial. It is the defendant's burden to overcome the presumption of lack of due diligence. Defendant could have discovered the information contained in McCormick's testimony through due diligence—i.e., issuing a subpoena, seeking a material witness order or other court assistance in accessing McCormick, or further investigating the information known by other witnesses. Since defendant failed to pursue the available information, he is unable to establish a necessary element of his MAR. Though "[t]he decision of whether to grant a new trial in a criminal case on the ground of newly discovered evidence is within the trial court's discretion and is not subject to review absent a showing of an abuse of discretion," a trial court "by definition abuses its

discretion when it makes an error of law." *Rhodes*, 366 N.C. at 535–36, 743 S.E.2d at 39 (first quoting *State v. Wiggins*, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993), then quoting *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996)). Here the trial court made an error of law when it concluded that defendant "could not have discovered or made available the new evidence from McCormick with due diligence." The decision of the Court of Appeals should be affirmed. Therefore, I dissent.

Justice BARRINGER joins in this dissenting opinion.